**AIR PRODUCTS AND CHEMICALS, INC., Plaintiff,**

v.

**EATON METAL PRODUCTS CO., et al., Defendants.**

**C.A. No. 02–CV–1277.**

United States District Court, E.D. Pennsylvania.

March 31, 2003.

Howard M. Klein, Andrew Hanan, Marianne Bechtle Daniels, Lauren A. Schochor, Conrad O'Brien Gellman & Rohn, P.C., Philadelphia, PA, for Plaintiff.

Daniel R. Frost, Scott S. Barker, Timothy W. Gordon, Holland & Hart LLP, Denver, CO, Debra S. Goodman, Margolis Edelstein, Philadelphia, PA, John C. Sullivan, Stephen R. Bishop, Post & Schell, PC, Philadelphia, PA, for Eaton Metal Products Co., defendant.

Mark H. Scoblionko, Scoblionko, Scoblionko, Muir & Bartholomew, Allentown, PA, R. Dennis Withers, Esq., RObins, Kaplan, Miller & Ciresi L.L.P., Atlanta, GA, for Hartford Steam Boiler Inspection and Ins. Co., defendant.

Larry B. Lipe, Mark E. Dreyer, Melodie Freeman-Burney, Conner & Winters, Tulsa, OK, Timothy T. Trump, Tulsa, OK, Christopher J. Pakuris, Margolis Edelstein, Matthew J. Zamites, Philadelphia, PA, for Lumbermen's Mut. Cas. Inc. Co., defendant.

### MEMORANDUM AND ORDER

Van ANTWERPEN, District Judge.

Plaintiff Air Products and Chemicals, Inc. ("Air Products") moves to amend its first amended complaint, filed July 19, 2002, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure based on new evidence obtained during discovery that it alleges support a new claim of fraud against defendants Eaton Metal Products Co. ("Eaton"), Lumbermens Mutual Casualty Insurance Co. ("Lumbermens") and The Hartford Steam Boiler Inspection and Insurance Company ("HSB"). Defendants contend that the plaintiff's motion should be denied as frivolous because the count it seeks to add alleging fraud is barred by the economic loss doctrine and/or the gist of the action doctrine. In the alternative, the defendants argue that even if the motion is not frivolous, they would be subject to undue prejudice should it be granted.

Presently before us are Plaintiff's Motion for Leave to Amend the Complaint, filed February 14, 2003, and accompanying Memorandum of Law; defendant Eaton's Brief in Opposition to Air Products and Chemicals, Inc.'s Motion for Leave to Amend the Complaint, filed March 11, 2003; Defendant The Hartford Steam Boiler and Inspection and Insurance Company's Opposition to Plaintiff's Motion for Leave to Amend the Complaint, filed March 13, 2003;[1] and Plaintiff Air Products and Chemicals Inc.'s Reply Brief in Support of its Motion for Leave to Amend the Complaint, filed March 17, 2003.[2] For the reasons discussed below, we grant the plaintiff's motion for leave to amend its complaint.

### I. STANDARD OF REVIEW

█ Rule 15(a) of the Federal Rules of Civil Procedure provides that, when an answer has been filed, a plaintiff may amend her complaint by consent of the

---

1. HSB's brief adopts in full the arguments put forward by Eaton and makes no new arguments of its own.

2. We granted Air Products leave to file a Reply brief by our Order dated March 13, 2003.

adverse party or by leave of the court, which "shall be freely given when justice so requires." Fed.R.Civ.P 15(a). The Third Circuit has noted that the courts have demonstrated a "strong liberality" in their interpretation of this rule. *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.,* 663 F.2d 419, 425 (3d Cir.1981). Indeed, determinations as to whether to allow amendment are left within the trial court's discretion, which should be exercised in favor of granting leave to amend except in unusual circumstances. Thus, as the Supreme Court has stated,

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such an undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The Third Circuit has emphasized that among these factors, "prejudice to the non-moving party is the touchstone for the denial of an amendment." *Heyl,* 663 F.2d at 425. Mere delay, without more, "does not require that a motion to amend a complaint be denied." *Adams v. Gould, Inc.,* 739 F.2d 858, 868 (3d Cir.1984). Instead, "to become a legal ground for denying a motion to amend, [delay] must result in prejudice to the party opposing the motion". *Kiser v. General Elec. Corp.,* 831 F.2d 423 (3d Cir.1987).

■ The burden of showing undue prejudice rests with the party opposing amendment. *Id.* at 427. This is a "heavier burden than claiming prejudice." *Heyl,* 663 F.2d at 426. In order to make the requisite showing of prejudice, the adverse party "is required to demonstrate that its ability to present its case would be seriously impaired were the amendment allowed." *Dole v. Arco Chemical Co.,* 921 F.2d 484, 488 (3d Cir.1990).

■ An adverse party may also succeed in opposing a motion for leave to amend by demonstrating that it is futile. *Shane v. Fauver,* 213 F.3d 113, 115 (3d Cir.2000). Futility exists where the added claim would be subject to dismissal under Rule 12(b)(6), and in such cases the motion for leave to amend should be denied. *Id.* In making this determination, a court is to apply the standards applicable to a motion under Rule 12(b)(6). *See Massarsky v. General Motors Corp.,* 706 F.2d 111, 125 (3d Cir.1983) ("The trial court may properly deny leave to amend where the amendment would not withstand a motion to dismiss."). Thus, the proposed amended pleading must be viewed in the light most favorable to the plaintiff and should not be rejected unless it is clear that the plaintiff is not entitled to any relief thereunder. *Epstein v. Township of Whitehall,* No. Civ.A. 88–0534, 1989 WL 73741, at *2 (E.D.Pa. June 29, 1989). Nevertheless, it is not required that the parties "engage in the equivalent of substantive motion practice upon the proposed new claim; [what is required is] that the newly asserted claim appear to be sufficiently well-grounded in fact or law that it is not a frivolous pursuit." *Cooper v. Ficarra,* No.Civ.A. 96–7520, 1997 WL 587339, at *3 (E.D.Pa. Sept.12, 1997). Thus, under "the liberal pleading standard applied to the amendment of pleadings, courts place a heavy burden on opponents who wish to declare a

proposed amendment futile." *Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc.,* 106 F.Supp.2d 761, 765 (D.N.J.2000).

█ This is a diversity action, thus in determining whether Air Products' amended complaint could survive a motion to dismiss, we must apply Pennsylvania substantive law. *Erie Railroad v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (when federal jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332, federal courts must, "[e]xcept in matters governed by the Federal Constitution or by Acts of Congress, ... [apply] the law of the State.") Though we apply federal procedural rules, the forum state's laws govern substantively. *See Commissioner of Internal Revenue v. Bosch's,* 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). In this case, the governing standards are Pennsylvania's, as established by the Pennsylvania Supreme Court. As the Third Circuit explained, applying *Erie,* "While the Federal Courts should properly employ its [sic] own rules of procedure to secure the just, efficient and prompt determination of all claims inherent in any litigation before it, nevertheless the ultimate results reached must be such as accord with the substantive jurisprudence of the State of the forum." *Smith v. Whitmore,* 270 F.2d 741, 745 (3rd Cir.1959) (internal citations omitted).

Lower state court decisions are persuasive, but not binding, on the federal court's authority; if the State's highest court has not spoken on a particular issue, the "federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State." *Id.; see also Polselli v. Nationwide Mut. Fire Ins.,* 126 F.3d 524, 528 (3d Cir.1997); *Scranton Dunlop, Inc. v. St. Paul Fire & Marine Ins. Co.,* 2000 WL 1100779, at *1 (E.D.Pa.Aug.4, 2000)

("Since this is a matter of state law that has not been decided by the Pennsylvania Supreme Court, a prediction must be made as to how that court would rule if confronted with the same facts.").

## II. FACTUAL SUMMARY

We briefly outline the facts that Air Products alleges to support its motion for leave to amend its complaint. Although there may be dispute as to some of these allegations, we take them, for the purposes of this motion, as fact, just as we would in evaluating a motion to dismiss under Rule 12(b)(6).

From 1994 through 2001, Air Products contracted with Eaton to purchase approximately 100 pressure vessels to be constructed in compliance with the American Society of Mechanical Engineers Boiler and Pressure Vessel Code ("ASME Code" or "Code"). The ASME Code imposes a comprehensive and rigorous framework of rules for the design, fabrication, testing and inspection of pressure vessels. In order to manufacture ASME Code compliant pressure vessels, a manufacturer must obtain from the American Society of Mechanical Engineers ("ASME") a Certificate of Authorization for each manufacturing plant that is to build Code compliant pressure vessels. To obtain one of these certificates, the manufacturer must, *inter alia,* develop and implement an ASME-approved written Quality Control System and submit to thorough review of its manufacturing facilities. Upon review of the information thus acquired, the ASME determines whether to issue a Certificate of Authorization.

For as long as a manufacturer wishes to construct ASME Code compliant pressure vessels and maintain its Certificate of Authorization, it must subject itself to continuous independent inspection and auditing by a certified Authorized Inspection Agen-

cy ("AIA"). The AIA must provide independent supervision over all aspects of pressure vessel fabrication to ensure that it is done in accordance with ASME code. Included in the AIA's supervisory responsibilities is the duty to verify that each manufacturing plant at which a vessel is fabricated has been issued a valid Certificate of Authorization.

From 1984 through 1998, Eaton contracted with Lumbermens to act as its AIA. From 1998 onward, HBS has provided AIA services to Eaton.

Prior to Air Products entering into contract with Eaton, Eaton represented to Air Products that it possessed the necessary certifications to manufacture ASME Code approved pressure vessels. Eaton, Lumbermens and HSB continued to represent to Air Products throughout the course of the pressure vessels' construction that each vessel had been constructed in accordance with the ASME Code.

In May 2001, Air Products discovered a serious crack in the metal wall of one of the Eaton-manufactured pressure vessels. Metallurgists determined that the through-wall crack was caused by the presence of excessive amounts of hydrogen in the weld, a defect which frequently results from improper welding procedures. Air Products later discovered more than 1200 similar defects in approximately three-quarters of the vessels it had purchased from Eaton. As we have previously noted, the uses to which these pressure vessels are put, including the storage and manufacture of Hydrogen gas under extreme pressure, are of such nature that any defect poses a risk of serious explosion. *See* Memorandum and Order of October 7, 2000 at p. 4.

During the course of discovery, Air Products has learned that one of the manufacturing plants at which much of the vessel construction occurred was not properly certified by the ASME to manufacture ASME Code compliant pressure vessels. None of defendants' disclosures to date have demonstrated that this plant in fact had or has a Certificate of Authorization from the ASME. From before Air Products and Eaton entered into any contract throughout the arrangement for purchase of pressure vessels over a seven year period, Eaton, Lumbermens and HBS all represented to Air Products that Eaton was ASME certified to manufacture ASME Code compliant pressure vessels and that the vessels manufactured by Eaton were, in fact, ASME Code compliant.

## III. DISCUSSION

Defendants oppose Air Products' motion for leave to amend its complaint on three grounds. First, they argue that because Air Products suffered only economic injury as a result of the alleged tort of fraud, Air Products' amendment would be subject to dismissal based on the doctrine of economic loss and that the motion to amend is therefore futile. Second, they argue that Air Products is, by its amendment, attempting to convert an action that properly lies in contract into one based on tort theories, and that such an amendment would be subject to dismissal based on the gist of the action doctrine, thereby making the motion for leave to amend futile. Finally, the defendants assert that granting the plaintiff's motion would subject them to undue prejudice.

### A. ECONOMIC LOSS

As this is a diversity case where Pennsylvania substantive law controls, we must predict how the Pennsylvania Supreme Court would rule on the question of whether intentional fraud may be barred by the economic loss doctrine by "giving 'proper regard' to the relevant rulings of other courts of the state." *Robertson v.*

*Allied Signal, Inc.*, 914 F.2d 360, 378 (3d Cir.1990). "In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule." *Gares v. Willingboro Twp.*, 90 F.3d 720, 725 (3d Cir.1996); *also U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 93 (3d Cir.1996) ("The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise.").[3]

 The economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir.1995). In Pennsylvania, the purpose of the economic loss doctrine is to maintain the separation between the law of contract and the law of tort. *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 387 Pa.Super. 537, 564 A.2d 919, 925 (1989). The economic loss doctrine originally applied only to product liability claims, with the expectation that parties could recover purely economic damages under contract theory. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). The expanded reach of the doctrine to cover negligence has been justified on the basis that parties can protect themselves by negotiat-

ing the terms of a manufacturer's liability. *Id.* at 872–73, 106 S.Ct. 2295. Pennsylvania courts addressing the economic loss doctrine have accepted the Supreme Court's rationale and focused on the ability of the purchaser to recover economic harm under a breach of warranty claim. *REM Coal Co. Inc. v. Clark Equipment Co.*, 386 Pa.Super. 401, 563 A.2d 128 (1989) (en banc). Thus, "negligence and strict liability theories do not apply in an action between commercial enterprises involving a product that malfunctions where the only resulting damage is to the product itself." *REM Coal*, 563 A.2d. at 134.

 Neither the Pennsylvania Supreme Court nor any Superior Court has determined whether the economic loss doctrine applies to intentional fraud or misrepresentation claims. *David Pflumm Paving & Excavating, Inc. v. Foundation Srvcs. Co.*, 816 A.2d 1164, 1171, n. 2 (Pa.Super.2003) (declining to reach the issue, and noting that as of the date of decision, February 3, 2003, no Pennsylvania Supreme or Superior Court case addressed the question). The lower Pennsylvania courts have, as far as we can tell, unanimously ruled that such claims are not barred by the economic loss doctrine. *E.g., Oppenheimer v. York Intern.*, No. 4348, 2002 WL 31409949, at *6 (Pa.Com.Pl. Oct. 25, 2002) ("This court does not believe that intentional misrepresentation and outright dishonesty, if they can indeed be proven, are properly redressed by breach

---

**3.** The defendants argue that we have already ruled that Air Products' tort claims must be dismissed under the economic loss doctrine and that this ruling, issued in our June 12, 2002 Memorandum and Order, constitutes the law of the case. This argument is without merit. Although we did decide that the tort claims asserted by Air Products at the time of that motion were subject to dismissal under the economic loss doctrine, none of those claims alleged intentional torts. We have not

ruled on the issue of whether intentional tort claims are barred by the economic loss doctrine, and therefore the law of the case doctrine has no applicability here. *See Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir.1982) ("Under the law of the case doctrine, *once an issue is decided,* it will not be relitigated in the same case, except in unusual circumstances.") (emphasis supplied).

of contract or warranty action."); *Zwiercan v. General Motors Corp.*, No. 3235, 2002 WL 31053838, at *6 (Pa.Com.Pl. Sept. 11, 2002) ("In declining to extend the application of the economic loss doctrine to intentional fraud claims, this Court noted, there is an absence of Pennsylvania case law on the subject, but found support for the proposition that the doctrine should not bar claims where the representation is intentionally false."); *Worldwideweb Networx Corp. v. Entrade, Inc.*, 2002 WL 1472336, at *3 (Pa.Com.Pl. June 20, 2002) ("[T]he economic loss doctrine does not apply to intentional tort claims."); *Teledyne Tech. Inc. v. Freedom Forge Corp.*, No. 3398, 2002 WL 748898, at *11 (Pa. Com.Pl. Apr. 19, 2002) ("[I]f Pennsylvania law were to apply, the economic loss doctrine would not bar the plaintiff's intentional misrepresentation claim."); *Amico v. Radius Communications*, No. 1793, 2001 WL 1807924 (Pa.Com.Pl. Jan 9, 2001) (holding that economic loss doctrine does not apply to intentional fraud claims); *First Republic Bank v. Brand*, 50 Pa. D. & C. 4th 329 (Pa.Com.Pl. Dec. 19, 2000) (holding that the economic loss doctrine does not apply to fraudulent misrepresentation claim).

We are reluctant to oppose this great weight of authority from Pennsylvania's lower courts. Moreover, we find that the underlying purposes of the economic loss doctrine suggest that the Pennsylvania Supreme Court would rule that it does not apply to this kind of fraudulent misrepresentation. As noted above, the economic loss doctrine is premised on the notion that parties to a contract may protect themselves from negligence or defective products by negotiating the liability terms of the contract. *East River S.S. Corp.*, 476 U.S. 858, 872–73, 106 S.Ct. 2295, 90 L.Ed.2d 865. We believe that in both theory and practice, it is impracticable, if not impossible, for parties to negotiate

terms regarding what happens if one of them is intentionally deceiving the other. Indeed, if there were deception in the inducement to agree to such terms, we foresee an endless series of sub-agreements as to what happens if one party has intentionally deceived the other into signing an intentional-deception clause. The notion that parties are free to allocate risks of negligence or defect fails when one party is intentionally deceiving the other. *Brand*, 50 Pa. D. & C. 4th at 344 ("A party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to that contract. Public policy is better served by leaving the possibility of an intentional tort suit hanging over the head of a party considering outright fraud.") (internal citations omitted).

We are not alone among the Federal District Courts of Pennsylvania in reaching this decision, but despite the unanimous nature of relevant state court decisions, there is a significant split of opinion. *Blue Mountain Mushroom Co., Inc. v. Monterey Mushroom, Inc.*, No.Civ.A. 00–4915, 2002 WL 31991129, at *6 (E.D.Pa. Sept.5, 2002); *compare North Amer. Roofing & Sheet Metal Co.*, No.Civ.A. 99–2050, 2000 WL 230214 at *7 (E.D.Pa. Feb.29, 2000) (holding that the economic loss doctrine does not apply "if the representation at issue is intentionally false.") (citing *Palco Linings Inc. v. Pavex Inc.*, 755 F.Supp. 1269, 1274 (M.D.Pa.1990)) *with Montgomery Cty. v. Microvote Corp.*, No.Civ.A. 97–6331, 2000 WL 134708, at *7 (E.D.Pa. Feb.3, 2000) (economic loss rule bars recovery for both negligent and intentional misrepresentation). Without discussing the decisions of the lower Pennsylvania courts, the Third Circuit has noted this split and issued a ruling to settle it which we must take as binding precedent. *Wer-*

*winski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir.2002).

The Third Circuit in *Werwinski* predicted that the Pennsylvania Supreme Court would apply the economic loss doctrine to claims of intentional fraud. *Id.* at 681. However, in doing so, the court appeared to carve out a "limited exception to the economic loss doctrine for fraud-in-the-inducement claims if the fraud is extraneous to the contract and not interwoven with the breach of contract." *Foster v. Northwestern Mut. Life*, No.Civ.A. 02–2211, 2002 WL 31991114, *2, 2002 U.S. Dist. LEXIS 15078, at *7 (E.D.Pa. July 29, 2002). Indeed, the court cited with approval a trend in the case law of the federal courts " 'recogniz[ing] a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent[ly] of the underlying contract.' " *Werwinski*, 286 F.3d at 676 (internal citations omitted). Claims arise independently of the underlying contract when they do not "relate to the quality or characteristics of the goods sold." *See id.* at 676, 677, 678. In reaching this conclusion, the court implied that the underlying rationale for the economic loss doctrine, that parties have a remedy in contract for misrepresentations regarding the subject matter of the contract, does not apply to fraud in the inducement claims that relate to matters other than the quality or character of the goods sold.[4] *See id.* at 679 ("On the other hand, appellants are unable to explain why contract remedies are inadequate to provide redress when the alleged

misrepresentation relates to the quality or characteristics of the goods sold."). We therefore believe that even if the Pennsylvania Supreme Court would apply the economic loss doctrine to claims of intentional fraud, they would not do so when the fraud alleged is in the inducement and does not relate to the quality or characteristics of the goods sold.

The defendants cite to *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F.Supp.2d 643 (E.D.Pa.2002), as persuasive authority for the proposition that what is alleged here is actually fraud with regard to the subject matter of the contract. In *Reilly Foam*, the plaintiff sponge manufacturer had contracted to supply defendant Rubbermaid with sponges for mop assemblies. 206 F.Supp.2d at 646. When Rubbermaid began purchasing sponges from another supplier, Reilly brought suit for, among other things, fraudulent misrepresentation, claiming that Rubbermaid had agreed to purchase sponges exclusively from Reilly knowing that it would do no such thing and thereby made a fraudulent misrepresentation. *Id.* at 658–659. *Reilly* is clearly distinguishable from the case at hand. In that case, it was obvious that the plaintiff was turning the essence of the contract, an exclusive purchasing agreement, into a tort by claiming that the defendant had never intended to follow through on its commitment. Indeed, the plaintiff appeared to go one step further and allege that the agreement to that term was a fraudulent inducement to get them to sign the contract. As

---

4. This appears to be a synthesis of the economic loss doctrine and the gist of the action doctrine, though the Third Circuit indicated it was treating the gist of the action doctrine merely as an analogy. *Werwinski*, 286 F.3d at 680, n. 8. At least one Pennsylvania court has criticized the Third Circuit for taking this approach. *Teledyne Tech.*, 2002 WL 748898, at *11, n. 17 ("Although the *Werwinski* court did not see itself as relying on the gist of the

action doctrine, it is difficult to see how the test adopted does anything more than apply a gist of the action test in an economic loss doctrine context. Indeed, *Werwinski* appears, in essence, to follow this court's holdings ... by finding an exception to the economic loss doctrine for intentional misrepresentation and fraud claims and barring only those claims that are already precluded under the gist of the action doctrine.")

the court aptly observed, "if every fraudulent inducement claim to survive [sic] independently of the contract, then 'tort law would swallow contract law.'" *Id.* at 658 (quoting *Werwinski,* 286 F.3d at 679.) Here, however, the substance of the contract was to provide ASME Code compliant pressure vessels. Eaton promised *as part of the contract* that it would produce such vessels and, concurrently, promised *as part of the inducement to complete the contract* that it was ASME certified to produce such vessels. *Reilly* therefore has no bearing on this case.[5]

▉ Here, it is clear that the claim Air Products seeks to add to its complaint alleges fraud in the inducement that does not relate to the quality or characteristics of the pressure vessels it bought from Eaton. When Air Products sought to contract for the manufacture and purchase of pressure vessels, it presumably had a number of sources to choose from. In choosing Eaton, Air Products relied on Eaton's representation that its facilities were ASME certified to produce ASME Code compliant vessels. Proposed Amended Complaint ¶ 159–162, 168–173.[6] Assuming Air Products' allegations are true, Eaton lied in making this representation and intended Air Products to rely on it. It is clear that, had Eaton not told Air Products it was ASME certified, Air Products would not have entered into contract with Eaton. That is a fraudulent misrepresentation.[7]

Moreover, Eaton's representation that it was ASME certified was separate and apart from the subject matter of the contract, i.e. the production of ASME Code compliant vessels. *See Reilly Foam,* 206 F.Supp.2d at 659 (the fraud in the inducement exception to the economic loss doctrine applies "only when a party makes a representation extraneous from the contract, [and] not when the representations concern the subject matter of the contract or the party's performance."). The distinction is easy to demonstrate by way of a hypothetical scenario in which Eaton was, in fact, ASME certified but nevertheless produced vessels that were *not* ASME Code compliant and then intentionally fraudulently represented to Air Products that the vessels were, in fact, ASME Code compliant. In such a case, it would be clear that any fraud claim would be barred by *Werwinski* 's rendition of the economic loss doctrine. But in a case where Eaton

---

5. We also reject the defendants' assertion that *Werwinski* bears on the question of whether Air Products is properly alleging a claim of fraudulent inducement as to a matter not relating to the quality or character of the goods sold. The plaintiffs in *Werwinski* claimed that the defendant's fraud consisted of manufacturing defective automobile transmission parts and failing to disclose that information to purchasers. 286 F.3d at 664. Thus there was no fraud in the inducement (except to the extent that non-disclosure of the defect could be said to be such) and, moreover, the fraud related precisely to the defective character of the goods purchased. The case before us is easily distinguishable from *Werwinski.*

6. Although we discuss primarily only Eaton's alleged acts of misrepresentation, we note also that the plaintiff alleges that Lumbermens and HSB committed fraud when they certified, as Eaton's AIA inspectors, that Eaton was ASME certified to produce ASME Code Compliant vessels. Our reasoning in this Memorandum applies equally to them, and we do not discuss their actions separately.

7. The elements of fraudulent misrepresentation are (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker to induce the recipient thereby; (4) justifiable reliance by the recipient on the misrepresentation; and (5) damage to the recipient as a proximate result of the misrepresentation. *Thomas v. Seaman,* 451 Pa. 347, 304 A.2d 134, 137 (1973).

intentionally misrepresented that it was ASME certified in order to convince Air Products to contract with it, and then failed to produce ASME Code compliant vessels, such as that alleged here, it is equally clear that Eaton's initial misrepresentation, and its misrepresentations at the time of delivery of each vessel, did not have to do with the quality or character of the *goods* but of the *parties* involved in the contract.[8] In such a case, we believe the economic loss doctrine does not bar a claim for fraudulent misrepresentation.

We recognize that there is a fine line between a fraudulent misrepresentation as to the quality of goods that may induce concession to a contract and fraudulent misrepresentation as to the quality of the parties that may induce concession to a contract. In this case, the line is even finer because Eaton's misrepresentation as to its ASME certification appears to *necessitate* that it also misrepresented that the vessels were ASME Code compliant upon delivery because vessels that are not manufactured by an ASME certified fabricator cannot be ASME Code compliant.[9] Of course, this latter misrepresentation is the same as that when any seller warrants that goods are of a certain quality when they are not, and presents a matter fully encompassed by the law of contract governing breach. Thus, if Air Products were seeking recovery on this claim because the vessels it purchased were not actually ASME Code compliant, i.e. because they were defective, this claim would be barred by the economic loss doctrine and Air Products would have its remedy in its allegations of breach.

But the former kind of misrepresentation is what we are dealing with here, notwithstanding the fact that it *may* have forced the latter kind of misrepresentations to occur. Air Products seeks to re-

---

**8.** The defendants assert that Air Products' proposed amendment contains allegations relating only to the fact that the vessels were not ASME Code compliant, citing one paragraph in proposed Count 18 that states, "For a manufacturer to construct ASME Code pressure vessels, the manufacturer must obtain from ASME a Certificate of Authorization ... The Certificate of Authorization is necessary to assure that pressure vessels will be manufactured in strict compliance with the ASME Code." Proposed Amended Complaint ¶ 165. This is a total mischaracterization of proposed Count 18. Each of the proposed additional allegations relates directly to Eaton's alleged misrepresentation regarding its ASME certification, Eaton's intent in making this misrepresentation and Air Products' reliance on the misrepresentation. *E.g.,* Proposed Amended Complaint ¶¶ 159 ("A fundamental precondition of Air Product's purchases from Eaton was that Eaton was properly certified by the ASME."), 160 ("Eaton was aware of this precondition and ... represented to Air Products that it possessed all necessary certifications from the ASME."), 161 ("[B]efore Air Products accepted the pressure vessels, Eaton continued to represent that it was qualified to manufacture [ASME Code compliant] vessels."), 162 ("Eaton's qualification as an ASME Code pressure vessel fabricator was material, and indeed, critical to Air Products' decision to award its contracts to Eaton."), 170 ("Eaton was, at all times, aware that its Pocatello plant was not ASME certified."), 171–173, 180.

**9.** The ASME Code is not before us. The plaintiff has implied that ASME Code compliant vessels cannot possibly be manufactured by a non-ASME certified manufacturer, *see* Proposed Amended Complaint ¶ 165, but we leave open the possibility that a pressure vessel may be constructed to ASME Code standards even by a non-certified manufacturer. Indeed, the Commonwealth provides that, where a pressure vessel is not shop-inspected during its construction for compliance with the ASME code, it may nevertheless be proven to be code compliant. *See* 35 P.S. § 1331.7(b). In this sense, it may be the case that Eaton's alleged fraudulent misrepresentation with regard to its ASME certification does *not,* in fact, necessitate the conclusion that it also fraudulently misrepresented the ASME Code compliant quality of the vessels themselves.

cover on this claim because it would never have entered into any purchase agreement, nor accepted delivery of any vessels, had it known that Eaton was not, in fact, ASME certified.[10] This claim is not barred by the economic loss doctrine because it does not relate to the character or quality of the goods sold, and Air Products has a remedy in its allegation of fraudulent misrepresentation in the inducement to contract.[11]

## B. THE GIST OF THE ACTION

The defendants also argue that Air Products' proposed fraudulent inducement claim is barred by the gist of the action doctrine. Though the Pennsylvania Supreme Court has never adopted this doctrine, both the Pennsylvania Superior Court and a number of United States District Courts have predicted that it would. *Etoll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa.Super.2002); *Bash v. Bell Tel. Co. of Pennsylvania*, 411 Pa.Super. 347, 601 A.2d 825 (1992); *Asbury Auto. Group LCC v. Chrysler Ins. Co.*, No.Civ.A. 01–3319, 2002 WL 15925, at *3 n. 3 (E.D.Pa. Jan, 7, 2002); *Caudill*

*Seed and Warehouse Co., Inc. v. Prophet 21, Inc.*, 123 F.Supp.2d 826, 833 n. 11 (E.D.Pa.2000). The gist of the action doctrine's purpose is to maintain the distinction between the theories of breach of contract and tort, and it precludes a plaintiff from recasting ordinary breach of contract claims into tort claims. *Bash*, 601 A.2d at 829. "When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is 'collateral' to conduct that is primarily tortious." *Sunquest Info. Sys. v. Dean Witter Reynolds*, 40 F.Supp.2d 644, 651 (W.D.Pa.1999). Thus, it is possible that, "although mere non-performance of a contract does not constitute a fraud[,] it is possible that a breach of contract also gives rise to an actionable tort." *Bash*, 601 A.2d at 829.

Until the Pennsylvania Superior Court examined the question in *Etoll*, no appel-

---

10. As we noted *supra*, there is also a distinction between the situation in which a party warrants its subjective expertise to induce a party to contract and that in which a party warrants its objective qualifications to induce a party to contract. If Air Products alleged merely that Eaton fraudulently represented that it was competent to produce ASME Code compliant vessels, we would likely find that there were insufficient grounds to sustain a fraud claim. Here, however, Air Products alleges that Eaton knew for certain that it had no ASME certification, *see* Proposed Amended Complaint ¶ 170, which is an entirely different matter. *Cf. Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365, 370 (E.D.Pa.1996) (representation of competence to perform contract did not become, upon breach, a fraudulent misrepresentation).

11. The particular fact which is alleged to have been misrepresented, namely that Eaton had

a Certificate of Authorization to fabricate ASME Code compliant vessels, is of such nature that we are more inclined than we otherwise might be to find that the economic loss doctrine does not bar Air Products' claim. This is because, as we discuss *infra*, Part III.B, Eaton's obligation to have such a Certificate was imposed not by contract but by state law, and not for technical or abstract reasons but because the uses to which pressure vessels are put pose an extreme danger of explosion and concomitant injury and damage if they are not manufactured properly. Eaton held itself out as a certified, i.e. safe, manufacturer of pressure vessels. They were obliged by state law to be truthful in this regard. The fraud they committed on Air Products was therefore, in a sense, "extraneous from the contract, [and] not ... concern[ing] the subject matter of the contract or the party's performance." *Reilly* 206 F.Supp.2d at 659, *citing Werwinski* 286 F.3d at 678.

late case in Pennsylvania had determined whether the gist of the action doctrine acted to bar claims alleging fraud in conjunction with breach of contract claims. *Etoll,* 811 A.2d at 15. After conducting an exhaustive survey of the state and federal case law on the matter, *id.* at 16–19, the court found that Pennsylvania courts

> have *not* carved out a categorical exception for fraud, and have not held that the duty to avoid fraud is always a qualitatively different duty imposed by society rather than by the contract itself. Rather, the cases seem to turn on the question of whether the fraud concerned the performance of contractual duties. If so, then the alleged fraud is generally held to be merely collateral to a contract claim for breach of those duties. If not, then the gist of the action would be the fraud, rather than any contractual relationship between the parties. *Id.* at 19.

Thus, "[t]he important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Redevelopment Auth. v. International Ins. Co.,* 454 Pa.Super. 374, 685 A.2d 581, 590 (1996) (en banc). In other words, the gist of the action is contractual where "the parties' obligations are defined by the terms of contracts, and not by the larger social policies embodied by the law of torts." *Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc.,* 247 F.3d 79, 104 (3d Cir.2001).

The defendants rely almost exclusively on *Etoll* for the proposition that the gist of the action doctrine bars the kind of fraudulent inducement claim at issue here. Facially, *Etoll* appears applicable because the plaintiffs in that case alleged that the defendant advertising company and executives had fraudulently represented "that they had the knowledge, expertise, and experience to advertise and market the product properly, when in fact they did not," where here, Air Products essentially alleges that Eaton represented that it had the necessary certification to manufacture the vessels properly. However, this facial similarity is misleading. The plaintiffs in *Etoll* were pursuing a fraud in the performance and *not* a fraud in the inducement claim. *Etoll,* 811 A.2d at 12 n. 2 ("Appellant's claims for fraud in the inducement of the contract, and for declaratory relief, are no longer part of the action."). As the *Etoll* court recognized, "[F]raud in the inducement of a contract would not necessarily be covered by [the 'gist of the action'] doctrine because fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself." *Etoll,* 811 A.2d at 17, (discussing *Foster,* 2002 WL 31991114, **2–3, 2002 U.S. Dist. LEXIS 15078, at *7.) Thus, *Etoll* is distinguishable from this case, though we think its reasoning sound.

The distinction between fraud in the inducement and fraud in the performance claims with regard to the gist of the action doctrine is crucial. This is because fraud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists. *See Foster v. Northwestern Mutual Life,* No.Civ.A. 02–2211, 2002 WL 31991114, **2–4, 2002 U.S.Dist. LEXIS 15078, at *7–8 (E.D.Pa. July 25, 2002) ("Plaintiff may show that he [was fraudulently induced into agreeing to the contract terms]. Such a showing would implicate the 'larger social policies' of a tort action (e.g., society's desire to avoid fraudulent inducement in the employment context), and would justify extending this case beyond the contractual allegations."); *See also Asbury Auto. Group,* 2002 WL 15925

at *3–4. In contrast, in the ordinary case the gist of the action doctrine will act to bar "fraud claims ... where a defendant's alleged failure to perform its duty under the contract is inexplicably transformed into a claim that this failure amounts to fraud." *Asbury Auto. Group*, 2002 WL 15925 at *3; *see, e.g. Caudill Seed & Warehouse Co.*, 123 F.Supp.2d at 833–34 (plaintiff's allegation that defendant's claim that software would work, breached when it did not work, was fraud was mere restatement of breach claim); *Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365 (E.D.Pa.1996) (plaintiff's claim that defendant's assertion of its competency to perform engineering work, belied by its breach, was fraud was not only barred by gist of the action doctrine but also insufficiently plead to constitute fraud).[12] Here, it is not that Eaton's alleged failure to perform under the contract was fraudulent (because it had promised to perform) but rather that Eaton's alleged misrepresentation about its objective qualifications to adequately perform was fraudulent.

The fact that Eaton misrepresented objective qualifications (i.e., that it was ASME certified) rather than subjective qualifications (e.g., that it was a skilled producer of industrial equipment) is important for another reason as well, which is that having those objective qualifications is required by public policy because of the extremely dangerous results of employing an improperly manufactured pressure vessel. *See* Proposed Amended Complaint ¶¶ 162–63. Thus, Eaton's obligation to be ASME certified to produce ASME Code compliant vessels was not imposed by contract, but rather "was imposed as a matter of social policy." *Redevelopment Auth.*, 685 A.2d at 590.

The requirement that manufacturers of pressure vessels be ASME certified is not only imposed by the private organization of the ASME, but is, in fact, a matter of Pennsylvania law, specifically the Boiler and Unfired Pressure Vessel Law, 35 P.S. § 1331.1 *et seq.* This statute mandates compliance with the ASME code in constructing and installing boilers and pressure vessels and authorizes the promulgation of regulations to describe and enforce such compliance. 35 P.S. § 1331.3 ("It shall be unlawful to install or use any boiler or unfired pressure vessel in this Commonwealth which does not comply with the provisions of this act and the regulations promulgated under this

---

12. *Sun Co.*, like *Etoll*, presents a facially similar but substantively different case than the one at hand. The defendant construction management services company had contracted to perform engineering, demolition and construction services for the plaintiff. When those services were incompetently or inadequately supplied, the plaintiff refused to pay and sued for breach. 939 F.Supp. at 366–368. When *Sun Co.* filed its complaint, it also alleged that the incompetent provision of services, a breach of the contract, was fraud because the services company had impliedly represented that it was competent to provide the contracted-for services and thereby fraudulently induced the plaintiff into signing the contract. Clearly, that allegation was a mere recasting of the breach of the contract claim. *Id.* at 370 (*citing Oxford Indus., Inc. v. Lumin-co, Inc.*, No.Civ.A. 86–6417, 1991 WL 87928, at *4 (E.D.Pa. May 22, 1991) for the proposition that "the mere non-performance of an agreement is not evidence of fraud."). Here, the allegation is not that Eaton committed fraud when it represented that it would produce ASME Code compliant vessels (indeed, that claim was dismissed by our Order of June 12, 2002), but rather that Eaton committed fraud when it represented that it was ASME certified to produce such vessels. Because of the objective nature of the latter representation, we believe that not only was it of different quality than the representation made by defendants in *Sun Co.* (because it was explicit rather than implicit) but also of different character (because it was not based on a subjective belief as to its own expertise). *Sun Co.* is therefore distinguishable.

act."); 35 P.S. § 1331.7 (shop inspection to show manufacture in compliance with ASME code required or other showing of compliance with ASME code required); 35 P.S. § 1331.14 (authorizing promulgation of regulations).

The Pennsylvania Administrative Code implementing the Boilers and Unfired Pressure Vessels Law mandates that "forced circulation boilers and boilers with no fixed steam and water line shall conform to the requirements of the ASME Code." [13] 34 Pa.Code § 3.5. This requirement also applies to "all boilers and unfired pressure vessels within this Commonwealth" subject to certain exceptions. 34 Pa.Code § 3.6. Moreover, violations of the code are subject to criminal penalties. 34 Pa.Code § 3.7. Boilers and pressure vessels must be inspected regularly by a state-certified inspector. 34 Pa.Code §§ 3.12, 3.14. Manufacturers of boilers and pressure vessels for use in the Commonwealth must register with the Commonwealth. 34 Pa.Code § 3.34. During construction, all such boilers and pressure vessels must be inspected by a state-certified inspector and "stamped upon completion with the ASME symbol." 34 Pa.Code § 3.65. Material specifications are the same as those in the ASME unless otherwise provided by the state. 34 Pa.Code § 3.91. Specifically with regard to unfired pressure vessels, all ASME Codes apply and manufacturers and inspectors of such vessels must comply with all ASME mandates. 34 Pa.Code §§ 3.141–145. Inspectors of such vessels may be either commissioned by the state or regularly employed by an insurance company so long as they have passed the relevant ASME examination. 34 Pa.Code § 3.143.

It is especially important to note that the purpose of the Pennsylvania Boiler and Unfired Pressure Vessel Law is to "set[ ] forth rules for safeguarding life, limb and property," and that its provisions "shall be enforced in conjunction with those provisions incorporated in the ASME Code." 34 Pa.Code § 3.2(a), (d).[14] In turn, the ASME's rigorous system of certification, inspection and auditing by independent entities is meant to ensure the safety of boilers and pressure vessels.

In this case, therefore, Eaton's obligation to have an ASME Certificate of Authorization was not imposed by contract, but rather by "larger social policies" like avoiding the construction and installation of devices which, when improperly built, pose a risk of catastrophic explosion and concomitant risk to "life, limb and property." 34 Pa.Code § 3.2(a).[15] Thus,

13. The code defines boilers to include "fired vessels for heating or vaporizing liquids other than water where these vessels are separate from processing systems and are complete within themselves." 34 Pa.Code. § 3.1. The code also covers unfired pressure vessels, which includes "any vessel in which pressure is obtained from an external source or from an indirect application of heat." 34 Pa.Code § 3.1.

14. Idaho, where the Pocatello manufacturing plant alleged not to have held an ASME Certificate of Authorization is located, has analogous regulatory provisions. See Id. A.D.C. §§ 17.06.01.011, 17.06.02.011 (incorporating ASME code by reference), et seq. Similarly, California, where many of the pressure ves-

sels were intended to be used, applies the ASME Code to the production, installation and inspection of pressure vessels. See Calif. Cod. Regs., Tit. 8, § 460(a).

15. In paragraph 164 of its proposed amended complaint, Air Products alleges that "in recognition of the inherent dangers in the use of pressure vessels, and to prevent *catastrophic accidents* which have from time to time resulted in destruction of property and loss of life, the ASME Code imposes a comprehensive and rigorous framework of rules for the construction of pressure vessels." (emphasis supplied). Air Products employs pressure vessels to store and manufacture Hydrogen gas under extreme pressures. As we have previously noted, Hydrogen gas is highly

when Air Products alleges that Eaton fraudulently represented that it was so certified, it alleges a tort, and not a breach of contract by another name.[16] *Bohler–Uddeholm Am., Inc.*, 247 F.3d at 104. We therefore will not deny Air Products' motion for leave to amend its complaint on the basis of the gist of the action doctrine.

## C. UNDUE PREJUDICE

■■■ Defendants make a half-hearted attempt to assert that they would be unduly prejudiced if Air Products is allowed to amend its complaint. They argue that they would be prejudiced because some Air Products officials would have to be deposed again, new written discovery would be required and because some further time and expense would be required to prepare to litigate the proposed additional claim. These additional difficulties are insufficient to satisfy the defendants' burden to establish undue prejudice. *See Kiser v. General Electric Corp.*, 831 F.2d 423, 427 (3d Cir.1987).

The defendants have not shown that they were "unfairly disadvantaged or deprived of the opportunity to present facts or evidence which [they] would have offered" had the amendment been made earlier. *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 426 (3d Cir.1981). Nor have they "demonstrate[d] that [their] ability to present [their] case would be seriously impaired were the amendment allowed." *Dole v. Arco Chemical Co.*, 921 F.2d 484, 488 (3d Cir.1990). Given that Air Products

only recently discovered the facts underlying this new claim and that these facts have been and still are under the control of the defendants, we do not see any substantial prejudice to the defendants in allowing Air Products to amend its complaint. We therefore grant the plaintiff's motion.

## IV. CONCLUSION

Air Products' proposed amendment will not be futile. It is not barred by the economic loss doctrine because it alleges fraud in the inducement to contract unrelated to the quality or character of the goods sold. It is also not barred by the gist of the action doctrine because it sounds in tort rather than contract on the basis that Eaton's obligation to obtain a Certificate of Authorization from the ASME, and Lumbermens and HBS's obligation to ensure that Eaton had such a Certificate, flowed from state law and social policy rather than from contract. Finally, the defendants have not demonstrated that they would suffer undue prejudice if Air Products' motion for leave to amend its complaint were granted. We therefore grant Air Products' motion. An appropriate order follows.

### *ORDER*

AND NOW, this 31st day of March, 2003, upon consideration of Plaintiff's Motion for Leave to Amend the Complaint, filed February 14, 2003, and accompanying Memorandum of Law; defendant Eaton's Brief in Opposition to Air Products and Chemicals, Inc.'s Motion for Leave to

---

flammable and, indeed, capable of rapid explosive combustion. We do not believe that it requires a great leap of faith to conclude that, particularly in light of the unique facts of this case, the state-imposed requirement that manufacturers of pressure vessels be ASME-certified is justified on grounds of social policy, and that therefore any fraud with regard to this requirement is a violation of an obli-

gation imposed by social policy rather than by contract. *See Redevelopment Auth.*, 685 A.2d at 590.

**16.** As with Eaton, Lumbermens and HSB's obligation to verify that Eaton's Pocatello plant was ASME certified was imposed by state law, not contract.

Amend the Complaint, filed March 11, 2003; Defendant The Hartford Steam Boiler and Inspection and Insurance Company's Opposition to Plaintiff's Motion for Leave to Amend the Complaint, filed March 13, 2003; and Plaintiff Air Products and Chemicals Inc.'s Reply Brief in Support of its Motion for Leave to Amend the Complaint, filed March 17, 2003, it is hereby ORDERED that Plaintiff's Motion for Leave to Amend the Complaint is GRANTED.