**AIR PRODUCTS AND CHEMICALS, INC., Plaintiff,**

v.

**EATON METAL PRODUCTS CO., et. al., Defendants.**

**Civil Action No. 02–CV–1277.**

United States District Court, E.D. Pennsylvania.

May 27, 2003.

Scott S. Barker, Holland & Hart LLP, Denver, CO, Stephen R. Bishop, Post & Schell, PC, Philadelphia, PA, Mark E. Dreyer, Conner & Winters, Melodie Freeman–Burney, Conner & Winters, Tulsa, OK, Daniel R. Frost, Holland & Hart, LLP, Denver, CO, Debra S. Goodman, Margolis Edelstein, Philadelphia, PA, Timothy W. Gordon, Holland & Hart LLP, Denver, CO, Larry B. Lipe, Conner & Winters, Tulsa, OK, Christopher J. Pakuris, Margolis Edelstein, Philadelphia, PA, Mark H. Scoblionko, Scoblionko Scoblionko Muir, Allentown, PA, John C. Sullivan, Post and Schell, Philadelphia, PA, Timothy T. Trump, Tulsa, OK, R. Dennis Withers, Robins, Kaplan, Miller & Ciresi LLP, Atlanta, GA, Matthew J. Zamites, Margolis Edelstein, Philadelphia, PA, for Defendant.

Marianne Bechtle, Frank R. Emmerich, Jr., Andrew Hanan, Howard Klein, Lauren A. Schochor, Conrad, O'Brien, Gellman & Rohn, PC, Philadelphia, PA, for Plaintiff.

## OPINION AND ORDER

Van ANTWERPEN, District Judge.

## INTRODUCTION

Plaintiff Air Products and Chemicals, Inc. ("Air Products") commenced an action in the Pennsylvania Court of Common Pleas of Philadelphia County on February 8, 2002 based upon alleged manufacturing defects in pressure vessels sold to Air Products by Eaton Metal Products Co. ("Eaton") at various times from 1994 through 2001. In addition to Eaton, Air Products named as defendants Lumbermens Mutual Casualty Insurance Co. d/b/a Kemper National Insurance Co. ("Lumbermens") and the Hartford Steam Boiler Inspection and Insurance Company ("HSB") based upon Air Products' asserted status as a third-party beneficiary of inspection contracts between them and Eaton. All parties agreed to discontinue that action, and Plaintiff filed its complaint in this court on March 13, 2002. Counts 15, 16 and 17 of Plaintiff's complaint allege, respectively, negligence, negligent misrepresentation and negligent provision of services on the part of Lumbermens and HSB. Defendant Lumbermens now moves for summary judgment on these counts on the basis that Pennsylvania's economic loss doctrine bars recovery in tort for purely economic losses.

The dispute between the parties in this case has already resulted in numerous motions for dismissal and/or partial judgment, some of which have considered the plaintiff's tort claims. Previously, on June 11, 2002, we granted Defendant Eaton's motion under Fed.R.Civ.P. 12(b)(6) to dismiss Air Products' negligence and strict liability tort causes of action against it, finding that these claims were barred by the economic loss doctrine. Memorandum and Order of June 11, 2002. We declined to dismiss these tort claims as against Lumbermens and HSB because the record at that point was insufficient to determine the applicability of Pennsylvania law to them. *Id.* On March 31, 2003, we granted Plaintiff Air Products leave to amend its complaint to include a claim against all three defendants of intentional fraud in the inducement of its contract to purchase pressure vessels from Eaton. *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, Civ.A.No. 02–1277, 272 F.Supp.2d 482, 2003 U.S. Dist. LEXIS 5716 (E.D.Pa., March 31, 2003).

On April 2, 2003, we granted Lumbermens' motion to reconsider our previous denial of its motion for partial summary judgment on Counts 13 and 14 of Plaintiff's complaint, which alleged breach of contract and breach of warranty of workmanlike inspection. We vacated our prior ordered and granted judgment to Lumbermens on the basis that these claims were barred by the statute of limitations because the equitable discovery rule did not apply. *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.*, 2003 U.S. Dist. LEXIS 6576 (E.D.Pa., Apr. 2, 2003). Following our April 2, 2003 order, only claims sounding in tort remained against Lumbermens. Lumbermens now moves for partial summary judgment as against the plaintiff's negligence-based tort claims (Counts 15, 16 and 17). Lumbermens' motion does not address the intentional fraud claim raised in Count 18 of Plaintiff's Second Amended Complaint.

Presently before us is the Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, for Partial Summary Judgment on Certain Tort Claims, filed April 11, 2003, and brief in support

thereof; Plaintiff Air Products and Chemicals, Inc.'s Brief in Opposition to Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, filed May 5, 2003; Reply Brief in Support of Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, for Partial Summary Judgment on Certain Tort Claims, filed May 16, 2003; Plaintiff Air Products and Chemicals, Inc.'s Sur–Reply Brief in Opposition to Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, for Partial Summary Judgment on Certain Tort Claims, filed May 22, 2003;[1] and Defendant Lumbermens Mutual Casualty Company's amended Reply Brief in Support of its Motion for Partial Summary Judgment on Certain Tort Claims, filed May 22, 2003.[2] For the following reasons, we grant Lumbermens' motion in part and deny it in part.

## I. STATEMENT OF JURISDICTION

We have original subject matter jurisdiction over claims between citizens of different states in which the monetary amount in dispute is greater than $75,000 under 28 U.S.C. § 1332. Plaintiff Air Products and Chemicals, Inc. is incorporated in the state of Delaware and has its principal place of business in Pennsylvania. Defendant Eaton Metal Products Co. is incorporated in Colorado and has its principal place of business in that state. Defendant Hartford Steam Boiler Inspection and Insurance Company is incorporated and has its principal place of business in Connecticut. Defendant Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies is incorporated and has its principal place of business in the state of Illinois. Plaintiff seeks $4.5 million in damages from each Defendant in each count of its Amended Complaint. As there is complete diversity between the parties and the amount in controversy exceeds $75,000, this court has jurisdiction to hear Plaintiff's complaint.

## II. STANDARD OF REVIEW

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202. All inferences must be drawn, and all

---

1. By our Order dated May 21, 2003, we granted plaintiff's uncontested Motion for Leave to File a Sur–Reply Brief, filed May 19, 2003.

2. Unhelpfully, counsel for Lumbermans makes no attempt to inform the court as to exactly which aspects of its original brief required or received amendment. We can discern only two differences between Lumbermens' amended reply brief and its original reply brief: one footnote (number four) has been added regarding a legal matter irrelevant to this motion, and the amended brief is printed on lower quality bond paper. We urge both parties' counsel that in the future when offering amended filings, they either direct the court to the arguments or factual statements in the filing that required change or provide the court only with those arguments or factual statements that were actually amended. Simply re-filing a thirty page brief, complete with its two-hundred or so pages of exhibits, with no indication of what makes it different from a nearly indistinguishable earlier submission does not make efficient use of either counsel's time or this court's and certainly does not make efficient use of client resources.

doubts resolved, in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985).

On a motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of dispute as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (quoting Fed. R.Civ.P. 56(e)); *see First Nat'l Bank of Pa. v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 248–49,106 S.Ct. 2505.

 When federal courts sit in diversity cases, they must apply the substantive law of the states where they sit. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When they are required to interpret or apply state law, they must consider and accept the decisions of the state's highest court as the ultimate authority regarding state law. *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, 553 (3d Cir.1985). When, however, the highest court of the state has not authoritatively considered the issue, "our disposition of such cases must be governed by a prediction of how the state's highest court would decide were it confronted with the problem." *McKenna v. Ortho Pharmaceutical Corp.,* 622 F.2d 657, 661 (3d Cir.1980). In making such a pre-

diction, we must give " 'proper regard' to the relevant rulings of other courts of the state." *Robertson v. Allied Signal, Inc.,* 914 F.2d 360, 378 (3d Cir.1990); *Gares v. Willingboro Twp.,* 90 F.3d 720, 725 (3d Cir.1996) ("In the absence of guidance from the state's highest court, we are to consider decisions of the state's intermediate appellate courts for assistance in predicting how the state's highest court would rule."); *also U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.,* 80 F.3d 90, 93 (3d Cir.1996) ("The rulings of intermediate appellate courts must be accorded significant weight and should not be disregarded absent persuasive indication that the highest court would rule otherwise.").

### III. FACTS

We have summarized the facts of this case in many of our previous memoranda.[3] *See Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* Civ.A.No. 02–1277, 256 F.Supp.2d 329 (E.D.Pa. 2003); *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* 2003 U.S. Dist. LEXIS 3204, at *2–5 (E.D.Pa., Feb. 27, 2003) *vacated by Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* 2003 U.S. Dist. LEXIS 6576 (E.D.Pa., Apr. 2, 2003); *Air Prods. & Chems., Inc. v. Eaton Metal Prods. Co.,* 2003 U.S. Dist. LEXIS 1259, at *6–8 (E.D. Pa., Jan 9, 2003); Memorandum and Order dated October 7, 2002, at 3–5. Here, we will discuss only those facts relevant to the present motion.

In approximately 1984, Lumbermens contracted with Eaton to perform inspections of pressure vessels manufactured by Eaton required under the American Society of Mechanical Engineers ("ASME") Code. Between 1994 and 2001, Eaton fabricated approximately one hundred high-pressure vessels for use in purifying hydrogen gas for Air Products. Lumber-

---

**3.** There are complicated issues in this case. Nevertheless, it would be helpful if the issues and evidence were all presented at the same time rather than on a piecemeal basis.

mens inspected the vessels built by Eaton for Air Products until approximately 1996. Lumbermens and Air Products had no direct contractual relationship. Eaton manufactured the allegedly defective vessels in stages at its Denver, Colorado, Pocatello, Idaho and Salt Lake City, Utah plants.

Although the parties appear to agree that Eaton used all three plants in the manufacture of the Air Products vessels, there is significant dispute as to where the inspections of those vessels occurred. Air Products' initial position was that Lumbermens performed "the majority of shop inspections at Eaton's Utah plant." It appears Air Products now argues that although many, if not most, inspections took place at the Pocatello plant, because those

inspections were controlled from and governed by policies in place at the Salt Lake City plant, the fact that they took place in Idaho is irrelevant.[4] Lumbermens contends that it inspected portions of each vessel at all three manufacturing facilities as each stage of production was completed. The confusion as to the location of the inspections derives primarily from the facts that Eaton and Air Products used different serial numbers to describe the same vessel, that Eaton appears to have used different serial numbers to refer to subsidiary parts than it did to refer to a completed vessel and that all three inspection control logs are handwritten in what is often nearly illegible scrawl.[5] The parties agree that no inspections occurred in Pennsylvania.

4. There is some dispute as to the legal import of the fact that Lumbermens apparently controlled the Pocatello inspections from Salt Lake City and that Pocatello manufacturing operations were governed by the Quality Control System created for Salt Lake City. *See* Def. Amdnd. Reply, at 5 n. 4. We do not believe these facts have any bearing on the question of which state's law ought to apply to the inspections performed in Idaho, though they may have bearing on other legal issues in the case.

5. By facsimile dated May 23, 2003, Air Products acknowledged that its allegation in its sur-reply brief that Lumbermens has misrepresented the facts on the issue of whether any inspections were performed in the Denver plant was based on a misapprehension of the facts. Because this allegation, if supported, could have lead to the imposition of sanctions under Fed.R.Civ.P. 11, we have undertaken a thorough independent review of the inspection control logs of each manufacturing plant, attached as exhibits B, C and D to Lumbermens' reply brief, and compared them to the Manufacturer's Data Reports attached as exhibit C to Air Products' brief in opposition to the motion. It is clear from this review that Lumbermens is well-justified in taking the position that initial manufacturing steps, and therefore initial inspections, were undertaken at the Denver plant. As to Air Products' specific allegation that the serial numbers cit-

ed by Lumbermens as evidence that work was performed in Denver on the Wilmington, California project are for a different project, it is clear that those serial numbers relate to subsidiary parts used in the final production of the vessels in this case. For example, the Manufacturer's Data Report for vessel number 9167 (or "Tk. 1" of "Job # 3512" in Lumbermens' parlance) clearly shows that the Top Head and Nozzles were manufactured at Eaton's Plant 1 with serial number 16827 and that the Bottom Head and Nozzle was manufactured at Eaton's Plant 1 with serial number 16828. *See* Pl. Opp. Exh. C., at unnumbered page 1 following the OA–59003 division. Eaton's Plant 1 is the Denver, Colorado plant, and the parts with those two serial numbers were inspected by Lumbermens in Denver on November 11 and 17 and December 9 and 13 of 1994. *See* Def. Reply Exh. D, at 132–34. It is apparent from our review of the relevant documents that Eaton utilized a different Job Number at its Denver plant than it did for the same work order at its Salt Lake City and Pocatello plants (which use the same Job Number) and that the smaller parts manufactured in Denver each had a serial number unrelated to the serial number of the pressure vessel in which they would eventually be installed. This results in the significant confusion evident in the parties' contentions and for Air Products' mistaken, though apparently good faith, belief that Lumbermens' reply brief misrepresented certain facts.

We need not resolve the factual dispute as to where the inspections occurred in order to dispose of the motion before us because, as we discuss *infra*, Part IV.A., the law of Colorado, Utah and Idaho is essentially identical with respect to the question of whether the plaintiff's negligence tort actions may proceed despite the fact that the plaintiff alleges only economic loss. Moreover, at least with respect to the question of where the Manufacturer's Data Reports were signed, the parties do not dispute that some were signed in Pocatello and some were signed in Salt Lake City. Neither party argues that any Manufacturer's Data Reports were signed in Denver.

Eaton shipped Air Products' vessels to various locations. None were shipped to or installed in Pennsylvania. Lumbermens signed the Manufacturer's Data Reports at Eaton's manufacturing plants in Utah and Pocatello. These documents were then sent to Pennsylvania, where they were reviewed and accepted by Air Products prior to each vessel's shipment.

The ASME code lays out comprehensive requirements for the manufacture of unfired pressure vessels. *See Air Prods.*, 256 F.Supp.2d 329. Utah, Colorado and Idaho and Pennsylvania have adopted the ASME Code by statute to govern the manufacture of unfired pressure vessels such as those involved here. Utah Code, 1953 § 34A–7–101 *et seq.*; 7 Co ADC 1101–5; Id. ADC 17.06.01–.05; 35 P.S. § 1331.1 *et seq.*; *Air Prods.*, 256 F.Supp.2d 329. The ASME requires a manufacturer to obtain a Certificate of Authorization to manufacture pressure vessels.[6] In order to obtain such a certificate, a manufacturer must develop and implement a written Quality Control System that ensures that all manufacturing steps will be in compliance with the code, contract with an Authorized Inspection Agency ("AIA") to review its Quality Control System and submit to comprehensive joint review of its manufacturing facilities by an ASME designee and the AIA. ASME Code, Section VIII, Div. 1, UG–117(d)–(f) (1992).

Furthermore, in order to maintain its ASME certification to produce unfired pressure vessels, a manufacturer such as Eaton must submit to regular, continuous and independent inspections by its AIA throughout the manufacturing process of each vessel. *Id.* at UG–117(f). Lumbermens recognized its crucial role in the safe manufacture of its clients' vessels in its April 20, 1995 Special Technical Instruction to is Authorized Inspectors, which stated, in part, "The purpose of this [Special Technical Instruction] is to remind you that accidents relating to the design and fabrication of pressure vessels do exist . . . You can't control operator error/poor maintenance but, through your diligent daily inspections, you can influence the design and fabrication activities of your clients." Pl. Opp. Exh. F.

Among the most basic duties of the AIA under the ASME code is to verify that each manufacturing plant has been issued a valid Certificate of Authorization from the ASME. ASME Code, Section VIII, Div. 1, UG–90(c)(1)(a).[7] In addition, the

---

**6.** The parties do not agree on exactly what this requirement entails. Air Products contends that a manufacturer must have a Certificate of Authorization for *each manufacturing plant* whereas Lumbermens argues that a manufacturer needs one Certificate for its primary facility but may cover subsidiary "field" facilities under the same Certificate. This issue is not before us presently and we need not resolve it here.

**7.** Air Products has alleged that Eaton failed to obtain such a certificate for at least one of the manufacturing plants subject to inspection by Lumbermens. *See* Second Amended Complaint, Count 18. We have previously noted the disagreement between the parties as to

AIA must verify the manufacturer is "working to a quality control system" and must "monitor the Manufacturer's Quality Control System." *Id.* at UG–90(c)(1)(a) and UG–91(b). In this regard, it is important to note that once the manufacturer's Quality Control System has been accepted by the ASME (a necessary prerequisite to the grant of a Certificate of Authorization), it becomes a part of the ASME code applicable to that plant and strict adherence to it is required. Pl. Opp. Exh. G.

In addition to monitoring compliance with the ASME Code (and the Quality Control System) during the manufacturing process, once a vessel has been completed, the AIA must review the Manufacturer's Data Report prepared by the manufacturer. ASME Code, Section VIII, Div. 1, UG–120(a). The AIA may sign this report, which verifies construction in compliance with the ASME Code, only when "the vessel, to the best of his knowledge and belief, is in compliance with all the provisions of this Division." *Id.* at UG–90(c)(1)(n).

The substance of Air Products' negligence claims against Lumbermens appears to be 1) that Lumbermens negligently conducted inspections during the manufacturing process, failing to note, for example, Eaton's lack of proper controls over welding supplies or the fact that the Pocatello plant had no Certificate of Authorization independently of the Salt Lake City plant, 2) that Lumbermens negligently signed the Manufacturer's Data Reports for vessels produced in the Salt Lake City plant when it was clear that they had not been produced in conformity with the ASME Code provisions governing the handling of welding supplies, and 3) that Lumbermens

negligently misrepresented to Air Products the ASME Code compliance of the vessels when it signed and presented the Manufacturer's Data Reports to Air Products.

## IV. DISCUSSION

Lumbermens does not challenge the legal sufficiency of the undisputed facts supporting Air Products' negligence counts, and we will not address that matter. Rather, Lumbermens moves for summary judgment on the basis of the economic loss doctrine. The parties disagree as to which state's law should apply to Air Products' negligence tort claims.

Air Products contends that because the majority of the inspection work was performed in Utah, and because the inspection work that was not performed in Utah was controlled by supervisors and quality control systems in Utah, Utah's law should apply.[8] Air Products also argues that even if Pennsylvania law were to apply to its negligence claims, Pennsylvania's economic loss doctrine does not apply to parties that are not in contractual privity with one another.

Lumbermens argues that Pennsylvania law should apply to Air Products' negligence claims because that is where Air Products suffered its injury. Lumbermens discounts the need to analyze Utah law because inspections occurred in Colorado and Idaho as well, thus attenuating any contacts Utah may have with the litigation. Lumbermens believes that Pennsylvania law would bar the plaintiff's tort actions but also argues that even if Utah law applied, its courts apply the economic loss doctrine in such a way as to bar the plaintiff's claims.

the meaning of this requirement. *See supra* note 6.

**8.** Air Products acknowledges that some inspections appear to have been performed at

Eaton's Denver, Colorado plant, but argues that they were so few in number as to make Colorado's contacts with the litigation "minimal" at best. Pl. Facsimile dated May 23, 2003.

We agree with neither side in full. Lumbermens is correct to the extent that an analysis of Utah law alone is insufficient to answer the question of what state's law should apply because both Colorado and Idaho have significant contacts with this case as well. However, we find that Utah, Colorado and Idaho would all allow the plaintiff's claims to proceed and we therefore will treat all contacts with those three states as if they occurred in a single state. We find, furthermore, that Utah law (which is identical in this respect to Colorado and Idaho law) and not Pennsylvania law applies to the plaintiff's negligence claims. We will therefore deny Lumbermens' motion with respect to Counts 15, 16 and 17 with one caveat: because Idaho does not recognize the tort of negligent misrepresentation, and because Idaho law applies to those acts of negligent misrepresentation that occurred there, we will grant Lumbermens' motion with respect to that portion of Count 16 that relates to Manufacturer's Data Reports that were signed in Idaho.

## A. Is There Any Conflict?

Before we perform any choice of law analysis, we first must decide whether Pennsylvania law actually conflicts with Utah, Colorado or Idaho law on the specific issue of whether the plaintiff's tort claims are barred by the economic loss doctrine.[9] Both sides argue that Pennsylvania law is in fact identical to Utah law—Air Products contends that the economic loss doctrine does not apply when a plaintiff is not in privity with the defendant and Lumbermens contends that Utah and Pennsylvania simply have the same version of the economic loss doctrine.

We need not discuss Air Products' argument that Pennsylvania does not apply its economic loss doctrine to cases in which there is no privity of contract between the parties because no matter how we decide that issue, it will not change the outcome of the case. This is so because we find, *infra* Part IV.B.2, that Pennsylvania law does not apply to Air Products' negligence claims. Lumbermens' argument that Pennsylvania and Utah use the same version of the economic loss doctrine is not well taken.

### 1. *Pennsylvania Economic Loss Doctrine*

We have previously discussed Pennsylvania's economic loss doctrine in some de-

9. We wish to emphasize that this is a different inquiry from the one we conduct *infra*, Part IV.B.2, on the question of whether a "false conflict" or a "true conflict" exists between the legal regimes of these states on this issue. The term "false conflict" describes a situation in which the legal rules of two states would treat the same situation differently, but in which the policy rationales underlying those rules indicate that only one state's interests would be harmed by the application of the other state's rules; in such a situation, the court must apply the rules of the state that would be harmed by the application of the other state's rules. *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897, 899–900 (1966). Though the concepts are distinct, courts in Pennsylvania appear to use the term "false conflict" to mean both a situation in which no conflict at all exists (the two states would apply the same rule) and a situation in which only one state's interests would be harmed by the application of the other state's rule. *Compare Lucker Mfg., A Unit of Amclyde Engineered Products v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir.1994) *with Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 856 (1970).

Before we even reach the "false conflict" question, we must determine whether, for lack of better terminology, a "real conflict" as opposed to "no conflict" exists; that is, we must determine whether these states would actually treat this issue any differently. If not, then we would apply the law of Pennsylvania. *See In re Bankers Trust Co.*, 752 F.2d 874 (3d Cir.1984) (using the term "false conflict" to describe what is in actuality a situation in which *no* conflict exists and then applying the law of the forum to that situation).

tail. *See Air Prods*, 256 F.Supp.2d 329. In Pennsylvania, "negligence and strict liability theories do not apply in an action between commercial enterprises involving a product that malfunctions where the only resulting damage is to the product itself." *REM Coal Co. Inc. v. Clark Equipment Co.*, 386 Pa.Super. 401, 563 A.2d 128 (1989) (en banc). The economic loss doctrine has been extended outside the realm of products liability to cases involving negligence in the performance of services contracts. *Ashburner Concrete and Masonary Supply, Inc. v. O'Connor Truck Sales, Inc.*, No. 489, 2001 WL 1808035, at *3 (Pa. Cm.Pl. Aug. 10, 2001) (*citing Hartford Fire Ins. Co. v. Associated Constr. and Management Corp.*, 2000 WL 424273, at *7 (E.D.Pa. Apr.19, 2000) (holding that economic loss doctrine bars negligence claims as to engineering services related to roof repair and reconstruction); *Factory Market, Inc. v. Schuller Int'l Inc.*, 987 F.Supp. 387, 397 (E.D.Pa.1997) (same); *Sun Co., Inc. v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365, 370 (E.D.Pa.1996) (economic loss doctrine applied to losses from breach of engineering services contract)).

As other courts have noted, Pennsylvania state courts are quite hostile to torts alleging economic losses. *See Public Srvc. Enter. Grp. v. Philadelphia Elec. Co.*, 722 F.Supp. 184, 193 (D.N.J.1989). Simply put, Pennsylvania "courts have consistently refused to recognize a cause of action in negligence or strict liability for economic injury unattended by physical injury or damage to real or personal property." *In re TMI Litigation Governmental Entities Claims*, 544 F.Supp. 853, 857 (M.D.Pa. 1982) *vacated and remanded*, 710 F.2d 117 (3d Cir.1983) (vacating and remanding to allow consideration of possible physical injuries). Indeed, they have even refused to do so when the alleged negligence led to a serious nuclear disaster. *General Pub. Util. v. Glass Kitchens of Lancaster*, 542 A.2d 567 (Pa.Super.1988) (ruling on plaintiff's claims arising out of the Three Mile Island incident).

The Third Circuit has predicted that the Pennsylvania Supreme Court would extend the doctrine beyond negligence and strict liability to include even cases of intentional fraud. *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir.2002). As we have noted, the Court of Appeals appeared to leave room for causes of action alleging intentional "fraud-in-the-inducement" claims if the fraud is extraneous to the contract and not interwoven with the breach of contract." *Air Prods.*, 256 F.Supp.2d 329; *Foster v. Northwestern Mut. Life*, No.Civ.A. 02–2211, 2002 WL 31991114, 2002 U.S.Dist.LEXIS 15078, at *7 (E.D.Pa. July 26, 2002). This exception does not apply here because the allegations at issue are of negligence, not intentional fraud in the inducement as to something extraneous to the contract.

Given these precedents, it is clear to us that if Pennsylvania law applies, unless Air Products is correct in contending that its lack of privity with Lumbermens nullifies the effect of the economic loss doctrine, its claims against Lumbermens would be barred by the Pennsylvania economic loss doctrine. As we noted, *supra*, we need not decide this issue. We will assume, without deciding, that the Pennsylvania economic loss doctrine acts to bar negligence claims even when there is no contractual privity between the plaintiff and the defendant.

### 2. *Utah Economic Loss Doctrine*

The economic loss doctrine in Utah as not as broad as it is in Pennsylvania. In 2002, the Utah Supreme Court adopted Colorado's version of the economic loss doctrine as expressed in *Grynberg v. Agri Tech, Inc.*, 10 P.3d 1267 (Colo.2000). Thus, "[t]he proper focus in an analysis under the economic loss rule is on the

source of the duties alleged to have been breached." *Hermansen v. Tasulis,* 48 P.3d 235, 240 (Utah 2002) (*quoting Grynberg,* 10 P.3d 1267). Where state law imposes a duty of care independent of the contract between the parties, "the economic loss rule does not bar a tort claim 'because the claim is based on a recognized independent duty of care and thus does not fall within the scope of the rule.'" *Id.* (quoting *Town of Alma v. AZCO Constr., Inc.,* 10 P.3d 1256, 1263 (Colo.2000)).

Prior to its decision in *Hermansen,* Utah applied the economic loss doctrine to bar negligence actions between commercial entities in only a few limited spheres. *Steiner Corp. v. Johnson & Higgins of California,* 196 F.R.D. 653, 657 (D.Utah 2000) ("Utah has never recognized the economic loss rule as applicable except as against claims of negligent design and construction of improvements to real property."). Thus, the doctrine foreclosed negligence claims for the improper design and construction of real property, *American Towers Owners' Ass'n., Inc. v. CCI Mechanical, Inc.,* 930 P.2d 1182, 1190–92 (Utah 1996), but did not prevent a purchaser from bringing a negligence action against the manufacturer of a defective product, *W.R.H. Inc. v. Economy Builders Supply,* 633 P.2d 42, 44 (Utah 1981). However, since the adoption in *Hermansen* of the "independent duty" exception, the Utah Supreme Court has cast some doubt on the continuing validity of *American Towers,* and we will not rely on it here. *Grynberg v. Questar Pipeline Co.,* 70 P.3d 1, 2003 WL 1408204, at *12 (Utah 2003) ("Since they were decided before we adopted Colorado's interpretation, ... we do not find *American Towers* [ ] and *SME Industries[, Inc. v. Thompson Ventulett, Stainback & Assocs., Inc.,* 28 P.3d 669 (Utah 2001) ] persuasive authority regarding the current state of the economic loss rule in Wyoming or Utah."). The Utah Supreme Court has also strictly limited the reach of *W.R.H.* to its facts, and declined to extend its rule to govern transactions between sophisticated commercial entities. *Salt Lake City Corp. v. Kasler Corp.,* 842 F.Supp. 1380, 1389 (D.Utah 1994) (*citing Paul Mueller Co. v. Cache Valley Dairy Ass'n,* 657 P.2d 1279, 1286 (Utah 1982)). Because Air Products and Lumbermens are sophisticated parties, *W.R.H.* is irrelevant to their dispute even if its reasoning could be applied to an engineering inspector rather than a manufacturer.

■ We therefore consider whether the "independent duty" exception to Utah's economic loss doctrine applies to Air Products' negligence claims against Lumbermens, and we decide that it does. Utah has only rarely had occasion to decide when there exists a duty independent of a contract sufficient to allow an exception to the economic loss doctrine.[10] Because it has adopted wholesale Colorado's version of the doctrine, we predict that the Utah Supreme Court would follow Colorado's fuller exploration of this issue. *See Questar Pipeline,* 70 P.3d 1 (interpreting Wyoming law, noting that both

---

10. Lumbermens offers the argument that because the Third Circuit in *Werwinski* defined the words "when the claims at issue arise independent[ly] of the underlying contract," as meaning when those claims do not "relate to the quality or characteristics of the goods sold," *see Werwinski,* 286 F.3d at 676–678, we should find that this is the same definition Utah courts would use to determine when "a claim is based on a recognized independent duty of care and thus does not fall within the scope of the" economic loss doctrine, *Hermansen v. Tasulis,* 48 P.3d 235, 240 (Utah 2002). Lumbermens offers no support for this dubious proposition, and we decline to accept it. Furthermore, both Utah and Colorado have developed standards for determining when an independent duty exists that are clearly different from those enunciated in *Werwinski.*

Utah and Wyoming follow Colorado's version of the economic loss doctrine, and discussing Colorado cases in that context).

We begin, however, with the case in which Utah adopted Colorado's economic loss doctrine, which appears to describe how to decide when a duty independent of contract exists for professionals who provide information:

> [When] the information is given in the capacity of one in the business of supplying such information, that care and diligence should be exercised which is compatible with the particular business or profession involved. Those who deal with such persons do so because of the advantages which they expect to derive from this special competence. The law, therefore, may well predicate on such a relationship, the duty of care to insure the accuracy and validity of the information.

*Hermansen,* 48 P.3d at 241.

Thus, because "a real estate broker is a licensed person or entity who holds himself out to the public as having particular skills and knowledge in the real estate field," she is required by state law to disclose known material defects in a property under consideration. *Id.*

This case obviously presents one very different from that considered in *Hermansen,* where the plaintiff was a relatively unsophisticated purchaser and the duty of care imposed was merely to disclose "facts materially affecting the value or desirability of the property *that are known.*" *Id.* (emphasis supplied). Nevertheless, the standard articulated by the Utah Supreme Court for determining when an independent duty exists is applicable: Lumbermens is a licensed entity that holds itself out to the public as having particular skills and knowledge in the mechanical engineering field; Eaton (and its clients) deal with Lumbermens because of "the advantages which they expect to derive from this spe-

cial competence." *Id.* Moreover, state law *does* impose "duty of care to insure the accuracy and validity of the information" by virtue of the ASME code. *Id.* In this respect, it must be noted that "the economic loss rule ... [was] never intended to bar well-established common law causes of action, such as those for neglect in providing professional services." *Steiner,* 196 F.R.D. at 658 (citing *Moransais v. Heathman,* 744 So.2d 973, 983 (Fla.1999)).

Here, Utah imposes a duty of care on those it authorizes to perform the duties of AIA inspectors of pressure vessels under the ASME: such inspectors must meet the nationally recognized standards of qualification, fitness and competency embodied in the ASME. Utah Code, 1953 § 34A–7–103(5), (8). All boilers must be manufactured and inspected in accordance with the ASME code. *Id.* § 34A–7–102; Utah ADC § R616–2–3. Inspectors are charged with the duty of inspecting both the manufacturing plant and each pressure vessel, as well as the Quality Control System, along a number of metrics. ASME Code, Section VIII, Div. 1, UG–90(c)(1) and UG–91(b).

These duties are owed to the manufacturer by operation of contract, but they are also owed to the public by operation of state law. The purpose of the inspection system, operated by the Utah Department of Safety, is to verify the "safety of construction, installation, condition and operation" of each pressure vessel manufactured or used in Utah. Utah Code, 1953 § 34A–7–103(1); *see also Mor Flo Indus., Inc. v. Board of Review of Indus. Comm'n,* 817 P.2d 328, 332 (Utah App.1991) (noting that "the ASME Code is designed to require minimum construction specifications for hot water boilers to protect the public," and that "[t]he purpose of the Utah Boiler Code is to insure the safety of those dealing with boilers."). A vessel may not be

placed into operation until an AIA verifies that it is "safe to operate for the purpose for which they are being used." *Id.* § 34A–7–103(5)(a)(ii). The regulations implementing the Utah Boiler Code were adopted for the purpose of "establishing reasonable safety standards for boilers and pressure vessels to prevent exposure to risks by the public and employees." Utah ADC § R616–2–1. In particular, "[b]oiler inspectors shall examine conditions in regards to the safety of the employees, *public*, machinery, ventilation, drainage, and into all other matters connected with the safety of persons using each boiler or pressure vessel." *Id.* § R616–2–8(B) (emphasis supplied).

The Utah Supreme Court in *Hermansen* found that because real estate brokers hold themselves out to the public as "having particular skills and knowledge in the real estate field" and are licensed by the state, they have a state-imposed obligation to disclose known material facts to buyers and may not seek refuge behind the shield of the economic loss doctrine for their failure to do so. 48 P.3d at 240–41. AIAs are required to hold themselves out to the public as having the qualifications, fitness and competence mandated by the ASME code, and are licensed by the state. Given the far greater concerns for public safety [11] surrounding a state-imposed system of ASME-compliant manufacturing and inspection of pressure vessels, we predict

that the Utah Supreme Court would not allow an AIA to escape liability for negligently provided professional inspection services on the basis of the economic loss doctrine. This prediction is bolstered by a consideration of relevant cases from Colorado.

Lumbermens argues that Colorado views the "independent duty rule" fairly narrowly, quoting a Colorado Federal District Court opinion for the proposition that, "[t]he salient inquiry is into the nature of the obligations assumed: if they are the same as or subsume the duties of care imposed by law, then the duty of care imposed in tort is no longer 'independent' of that agreed to in contract." *Tuchman v. Pell Rudman Trust Co.*, 245 F.Supp.2d 1156, 1159 (D.Colo.2003). The court then went on to find that because the contract between the parties had specified the duty of care owed by the defendants to the plaintiff, the plaintiff could not maintain a tort action based upon the same duty of care. *Id.* at 1160. However, we do not place great weight on this decision because we believe it has little bearing on situations where the parties at issue never negotiated a contract, as is the case here.[12]

The court in *Tuchman* found highly persuasive the notion that "the mere fact that independent duties exist as a matter of law does not mean that, once a broker/advisor enters into a contractual relationship with

---

**11.** We have previously discussed the serious public safety concerns requiring the proper manufacture of pressure vessels. *Air Prods.*, 256 F.Supp.2d 329, 339 n. 11 ("The particular fact which is alleged to have been misrepresented, namely that Eaton had a Certificate of Authorization to fabricate ASME Code compliant vessels, is of such nature that we are more inclined than we otherwise might be to find that the economic loss doctrine does not bar Air Products' claim. This is because, as we discuss *infra*, Part III.B, Eaton's obligation to have such a Certificate was imposed not by contract but by state law, and not for

technical or abstract reasons but because the uses to which pressure vessels are put pose an extreme danger of explosion and concomitant injury and damage if they are not manufactured properly. Eaton held itself out as a certified, i.e. safe, manufacturer of pressure vessels. They were obliged by state law to be truthful in this regard."); *Id.* at 339.

**12.** We also note that even if we found *Tuchman* relevant, the fact that is from a Federal District Court, and not the highest Colorado state court, demands that it not be given commanding influence.

a client, those duties remain 'independent' of those assumed and allocated in contract." *Id.* at 1159. Indeed, Colorado decisions applying the economic loss doctrine to bar negligence claims allegedly arising from an independent duty emphasize the existence of an *express* provision in a contract *between the parties* defining a standard of care. *Id.* at 1160 (the distinction between whether a duty of care arises from a contract or is independent of it depends on "whether the duty of care recognized in common law truly is, in a particular case, independent of the duties the parties have, *in fact, allocated to each other* in contract.") (emphasis supplied); *AZCO,* 10 P.3d at 1264 (finding contract expressly assigned a duty of care to the defendant to "guarantee its quality of workmanship and its materials"); *cf. Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313 (Colo.1980) (finding contract did not expressly provide for the inspection of a part of a boiler installed by defendant, and that therefore a negligence claim could proceed because an independent duty existed to inspect that part during the installation process). Unlike the parties in *Tuchman,* Air Products and Lumbermens never negotiated a contract with each other—just as in *Hermansen,* the Utah decision that adopted Colorado's economic loss doctrine, the land buyer and the broker had no contractual relationship.

Indeed, where the parties have not negotiated a contract with each other, Colorado has generally allowed tort claims to proceed even when they might otherwise be barred by the economic loss doctrine. *See, e.g., Cosmopolitan Homes v. Weller,* 663 P.2d 1041, 1043 (Colo.1983) (allowing subsequent purchasers to maintain an action in tort where first purchasers would not have been able to). In a case analogous to the one before us, the Colorado Court of Appeals considered a claim by a subcontractor against an engineering inspector for negligent inspections and negligent misrepresentation. *Dufficy & Sons, Inc. v. BRW, Inc.,* 74 P.3d 380 (Colo.Ct. App.2002) *r'hng den.* Jan. 9, 2003. The court identified several factors used to determine whether an independent duty is imposed by state law: 1) the risk involved, 2) the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, 3) the magnitude of the burden of guarding against injury or harm, and the consequences of placing a burden on the actor. *Id.* at 484. The court remarked that "no one factor is controlling, and the question of whether a duty should be implied is essentially one of fairness under contemporary standards." *Id.* Applying this reasoning, the court found that contractors are exposed to significant economic risk when they must implement a licensed engineer's plans and that licensed engineers would be no more burdened than they already are in having to comply with professional standards. Indeed, "[r]equiring licensed engineers to produce plans and specifications in accordance with professional standards requires them to perform their duties at a level that meets the reasonable expectation of those who employ and rely upon them.". *Id.* at 485. The court specifically found that although the city with whom the defendants had contracted could not maintain a tort action, both the "contractor and subcontractor have an independent tort claim" against both the inspector and the engineer. *Id.* at 486.

Applying the reasoning of *Dufficy* to the facts before us, we conclude that Lumbermens owed Air Products a duty independent of its contract with Eaton to perform its inspections with that degree of skill, care and knowledge required by the ASME code. As with the licensed engineers and inspectors in *Dufficy,* Lumbermens is already under an obligation to be ASME-certified, and allowing a negligence action against Lumbermens merely re-

quires them to perform at the level already mandated by the ASME code. The risk to which purchasers of negligently inspected and manufactured pressure vessels are exposed, discussed *supra* note 11, also militates in favor of recognizing an independent obligation for Lumbermens to perform inspections non-negligently.

We cannot predict with certainty whether Utah would apply its own standard for determining when an independent duty exists, as outlined in *Hermansen,* or Colorado's standard, as explained in *Dufficy.* We believe, however, that using either methodology, Utah would find that the ASME code, and its adoption by Utah statute, creates a duty of care independent of contract. We therefore find that Utah would apply its "independent duty" exception to its economic loss doctrine and would not bar Air Products' negligence claims as against Lumbermens.

### 3. *Colorado Economic Loss Doctrine*

As discussed at length, *supra* Part IV. A.2, Colorado and Utah apply the same version of the economic loss doctrine. Based on the precedent supplied by *Dufficy & Sons, Inc. v. BRW, Inc.,* 2002 WL 31601023 (Colo.Ct.App.2002) *r'hng den.* Jan. 9, 2003, we predict that Colorado would find an independent duty on the part of Lumbermens to conduct its inspections non-negligently.

### 4. *Idaho Economic Loss Doctrine*

■ We believe that Idaho, like Colorado and Utah, would apply an exception to the economic loss doctrine in this case. Idaho adheres to a general rule barring recovery for purely economic losses in tort. *Tusch Enters. v. Coffin,* 113 Idaho 37, 740 P.2d 1022, 1026 (1987). The Idaho Supreme Court has recognized only three exceptions to this general rule, two of which are clearly inapplicable to the facts before us.[13] An exception for those cases involving a "special relationship" between the parties, however, appears to us to apply to this case. *See Just's, Inc. v. Arrington Constr. Co.,* 99 Idaho 462, 583 P.2d 997, 1005 (1978).

A "special relationship" exists where "the relationship between the parties is such that it would be equitable to impose" a duty to exercise due care to avoid purely economic loss. *Duffin v. Idaho Improvement Ass'n,* 126 Idaho 1002, 895 P.2d 1195, 1201 (1995). Although the "special relationship" exception is limited to "an extremely narrow group of cases," we believe it covers the case at hand. *Id.*

The Idaho Supreme Court has held that insurance agents have a "special relationship" with their insureds because an insurance agent represents to the public that she has expertise relevant to a specialized function and, in doing so, induces reliance on her superior knowledge and skill. *McAlvain v. General Ins. Co. of America,*

---

**13.** The first of these exceptions covers situations in which the loss is parasitic to an injury to person or property. *Just's, Inc. v. Arrington Constr. Co.,* 99 Idaho 462, 583 P.2d 997, 1003 (1978). Economic losses, which do not fall within the reach of this exception, include, "costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.,* 97 Idaho 348, 544 P.2d 306, 309 (1975). Since the losses claimed here are purely economic, this exception is inapplicable.

The second exception is made for "unique circumstances requiring a different allocation of risk," such as damage to a commercial fishing ground caused by a negligent oil spill. *Just's,* 583 P.2d at 1005 (citing *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir.1974)). We do not believe the facts of this case present "unique circumstances" and decline to apply this exception.

97 Idaho 777, 554 P.2d 955, 958 (1976). In reaching its holding, the court remarked, "[w]hen an insurance agent performs his services negligently, to the insured's injury, he should be held liable for that negligence just as would an attorney, architect, engineer, physician or any other professional who negligently performs personal services." *Id.* at 958. Here, Lumbermens holds itself out to the public as having engineering expertise relevant to the specialized function of pressure vessel inspection. Like insurance agents, Lumbermens is licensed by and must adhere to standards adopted by the state of Idaho. *See Id.*; Id. ADC 17.06.01–.05. They provide the professional services of engineers and we predict that Idaho would hold them liable for negligence in performing their professional duties. *See Eliopulos v. Knox,* 123 Idaho 400, 848 P.2d 984, 992 (Ct.App.1992) ("The 'special relationship' exception generally pertains to claims against professionals who perform personal services, such as physicians, attorneys, architects, engineers and insurance agents.").

Our belief that the Idaho Supreme Court would apply its "special relationship" exception to this case is bolstered by a case involving non-professional services that is nevertheless similar to the one before us. In *Duffin,* the court considered claims of negligence levied by a farmer and purchaser of seed potatoes that had been certified as disease-free against the Idaho Crop Improvement Association (ICIA), the certification authority, which had failed to detect the disease. 895 P.2d at 1197–99. The ICIA was the only entity licensed to certify seed potatoes in Idaho, "held itself out as having expertise in the performance of a specialized function," and knew that its certifications induced farmers to purchase seed potatoes at a higher price. *Id.* at 1201. Here, Lumbermens is required to be licensed to perform pres-

sure vessel inspections, *see* Id. ADC 17.06.01–.05, holds itself out has having expertise in the performance of a highly specialized function and knew that by signing Eaton's Manufacturer's Data Reports, it induced Air Products into accepting delivery. Thus, even if we thought Lumbermens was not providing a professional service, creating a "special relationship" under *McAlvain,* applying the criteria outlined in *Duffin,* we would nevertheless find that there exists a "special relationship" between Lumbermens and Air Products under Idaho law and that the economic loss doctrine therefore would not bar Air Products' negligence claims.

**B. Choice of Law Analysis**

We have found that the economic loss doctrine of Pennsylvania is more encompassing and therefore differs significantly from the economic loss doctrine of Utah, Colorado and Idaho with regard to the specific issues before us. We therefore must conduct a choice of law analysis to determine which state's economic loss doctrine should apply.

■ A federal court sitting in diversity applies the choice of law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Kruzits v. Okuma Machine Tool, Inc.,* 40 F.3d 52, 55 (3d Cir.1994). As such, we must employ Pennsylvania's general choice of law rules in deciding which state's laws govern the negligence claims against Lumbermens.

Choice of law analysis in Pennsylvania consists of two steps. First, "the court must look to see whether a false conflict exists." *LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996). "A false conflict exists where only one jurisdiction's governmental interests would be impaired by the application of the other jurisdic-

tion's law." *Id.* If a false conflict exists, "the court must apply the law of the state whose interests would be harmed if its laws were not applied." *Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 187 (3d Cir. 1991).

If, however, the application of either state's law clearly frustrates the interests of the other state's law, then a "true conflict" exists and "a deeper analysis" is required. *Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 856 (1970). This analysis is a "hybrid approach that 'combines the approaches of both Restatement II (contacts establishing significant relationships test) and 'interest analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy.')'" *Carrick v. Zurich–American Ins. Grp.*, 14 F.3d 907, 909 (3d Cir.1994) (quoting *Lacey*, 932 F.2d at 187).

This analysis requires that we determine "which state has the greater interest in the application of its law." *LeJeune*, 85 F.3d at 1071. We must analyze the contacts of each state with the controversy, including, in the general case: the place of injury; the place where the conduct causing the injury occurred; the place of business or incorporation of the parties; and the place where the relationship between the partes is centered. Restatement (Second) of Conflict of Laws § 145(2); *Cipolla*, 267 A.2d at 856. The Restatement also provides specific methods of analyzing contacts in cases alleging certain torts, including that of misrepresentation (as is alleged in Count 16), where the rules of conflict of law are better defined. *See* Restatement § 145, cmt. e, § 148. Only those contacts which relate to the policies and interests underlying the particular issue before the court will be considered relevant. *Cipolla*, 267 A.2d at 856.

A threshold determination is therefore required before we can evaluate either whether a false conflict exists or, if not, which state has a greater interest in applying its laws: first we must determine the underlying policies and interests of the particular legal rules before us. Thus, we begin our discussion with an analysis of the purposes underlying the Pennsylvania, Utah, Idaho and Colorado versions of the economic loss doctrine.

### 1. *Purposes and Interests*

### a. Pennsylvania

The United States Supreme Court has identified two policies underlying the economic loss doctrine. First, parties to a commercial dispute are protected by rules of contract law, either by virtue of UCC or common law theories of warranty or by expressly contracted-for provisions in the contract that governs their transaction, and do not need the special protections of tort law. *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 871–73, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Specifically, "the parties may set the terms of their own agreements" by negotiating liability and warranty provisions. *Id.* at 873–74, 106 S.Ct. 2295. Second, allowing recovery for purely economic injuries might expose manufacturers to potentially unlimited liability for a chain of foreseeable (in the tort sense) injuries to economic interests that would not be cognizable under the consequential damages rubric of contract law. *Id.* at 874, 106 S.Ct. 2295.

As we have discussed previously, *see Air Prods.*, 256 F.Supp.2d 329, in Pennsylvania, the purpose of the economic loss doctrine is to maintain the separation between the law of contract and the law of tort. *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 387 Pa.Super. 537, 564 A.2d 919, 925 (Pa.Super.1989). Pennsylvania's intermediate courts have adopted the United States Supreme Court's formulation of the doctrine and the

reasons for it.[14] *REM Coal Co. Inc. v. Clark Equip. Co.*, 386 Pa.Super. 401, 563 A.2d 128, 132–134 (Pa.Super.1989) (en banc) (discussing and adopting the reasoning of *East River*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865). In *REM Coal*, the Superior Court specifically rejected a version of the economic loss doctrine that would have allowed tort claims to stand in cases in which the defect posed a serious risk of non-economic injury that did not materialize. *Id.* at 133.

We do not find persuasive the potential reasons for Pennsylvania's doctrine put forward by Lumbermens.[15] It is true, as Lumbermens argues, that "a state could have a host of reasons for limiting liability." *LeJeune v. Bliss–Salem, Inc.*, 85 F.3d 1069, 1072 (3d Cir.1996). However, Pennsylvania state courts have articulated only two reasons for its version of the economic loss doctrine. We are loath to invent rationales that have never been discussed by any Pennsylvania court.

Thus, Pennsylvania's interests in applying its economic loss doctrine in any given case can be characterized in two ways.

First, Pennsylvania has an interest in governing the terms of contracts which are negotiated within its borders, and the application of the economic loss doctrine to Pennsylvania commercial disputes encourages entities contracting in Pennsylvania to negotiate liability terms. Second, Pennsylvania has an interest in protecting manufacturers from excessive liability, and the application of the economic loss doctrine in cases involving Pennsylvania manufacturing defendants protects those entities from unforeseen liability.

#### b. Utah and Colorado

We find that the purposes underlying the economic loss doctrine in Utah and Colorado are the same given that Utah has adopted Colorado's version and both states apply the "independent duty" exception. *Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000).

Utah's interests in *not* applying the economic loss doctrine to bar the plaintiff's negligence claims are twofold. First, ex-

---

**14.** We note that although the court in *REM Coal* found particularly persuasive the argument that "warranty law is suited to economic loss cases because in such cases, the parties have the opportunity to have set the terms of their agreement regarding product value and quality in advance," 563 A.2d at 133, it is not clear that Pennsylvania courts limit the application of the economic loss doctrine to cases involving negotiated contracts, or even to cases involving parties that have negotiated with each other. Indeed, the most recent pronouncement by the Superior Court of the doctrine appears to apply it to bar tort claims even of third-party beneficiaries who, by definition, did not negotiate the terms of the contract. *David Pflumm Paving & Excavating, Inc. v. Foundation Srvcs. Co., et al.*, 2003 PA Super. 41, 816 A.2d 1164. The parties disagree on this issue but, as we have stated, we need not resolve it. However, it is clear that an underlying reason for the economic loss doctrine is to encourage parties to negoti-

ate liability provisions even if it may be the case that the Pennsylvania courts do not always require that a contract actually have been negotiated.

**15.** Lumbermens asserts, without authority, that Pennsylvania has "an interest in regulating the conduct of foreign entities that engage in business with its citizens, even where its law might arguably favor the foreign entity." Def. Reply at 18. While we do not disagree with this proposition, we find its expression in Pennsylvania's articulated rationale of encouraging parties to a contract to negotiate liability terms-in other words, if a foreign entity engages in business with Pennsylvania citizens by operation of a mutual contract, Pennsylvania clearly has an interest in regulating the terms of that contract. But there is no contract between Lumbermens and Air Products, and we decline to adopt Lumbermens' position.

tending Utah's economic loss doctrine to cover the provision of professional services would "excuse defendants from responsibility for damages even if caused by their professional malpractice." *Steiner Corp. v. Johnson & Higgins of California*, 196 F.R.D. 653, 657 (D.Utah 2000).[16] Second, Utah does not bar claims alleging only economic loss when the obligation alleged to have been breached is imposed by state law rather than by contract. Utah's interest in not applying the economic loss doctrine in such cases is the same as that of any state in applying its tort law-to govern the conduct of negligent actors within its borders. As we have stated, Colorado's interest in not applying its economic loss doctrine to this case are the same as Utah's.

#### c. Idaho

Idaho's "special relationship" exception is quite similar to Utah and Colorado's "independent duty" exception, as are the reasons for it. The Idaho Supreme Court has said that concerns of equity govern the application of the exception. *Duffin*, 895 P.2d at 1201. The underlying rationale for applying the exception to professionals, in particular, is that professionals hold themselves out to the public as having specialized expertise and know that clients will rely on that expertise in choosing their services. Thus, Idaho's interests in not applying the economic loss doctrine to bar

Air Products' negligence claims are the same as those of Utah and Colorado: first, to prevent professional malpractice and second, to govern tortious conduct by professionals within the borders of Idaho.

#### 2. *False Conflict or True Conflict?*

We now turn to an evaluation of whether any state's underlying interests in applying its law would be harmed by the application of another state's law in light of the contacts each state has with the litigation. We are aided in this task by a simplifying measure: because Utah, Colorado and Idaho have an identical version of the economic loss doctrine for purposes of this case, and because the rationales underlying that version of the doctrine are identical, we may treat all contacts occurring in any of those three states as if they occurred in but a single state. Restatement of Conflicts (Second) § 145, cmt. I ("When certain contacts involving a tort are located in two or more states with identical local law rules on the issue in question, the case will be treated for choice-of-law purposes as if these contacts were grouped in a single state."); *Hiller v. Franklin Mint, Inc.*, 485 F.2d 48, 51 (3d Cir.1973) (applying identical provision of the Restatement of Conflicts (Second) applicable to disputes governed by a theory of contracts, § 186, cmt. c); *Ashland Oil, Inc. v. Miller Oil Purchasing Co.*, 678 F.2d 1293, 1306 n. 14 (5th Cir.1982).[17]

---

**16.** We recognize that the Utah Supreme Court has cast some doubt on the continuing validity of the conceptual divide between real property construction and other kinds of cases. *See Grynberg v. Questar Pipeline Co.*, 70 P.3d 1, 2003 WL 1408204, at *12 (Utah 2003). Nevertheless, the reasoning supporting *Steiner's* refusal to extend the application of the doctrine to professional malpractice is consonant with the "independent duty" exception, and we believe that the Utah Supreme Court would continue to apply it.

**17.** We reject the false choice Lumbermens offers of either conducting a case-by-case analysis of each negligent act allegedly committed by Lumbermens or simply applying Pennsylvania law because such a case-by-case analysis would be too difficult. Even if we believed that a case-by-case analysis were necessary (and we do not, because the laws of Utah, Colorado and Idaho are the same with respect to the applicability of the economic loss doctrine to Air Products' negligence claims against Lumbermens), it would be improper simply to choose to apply Pennsylvania law because that is the easier course.

In the remainder of this section, therefore, we treat any contact that occurred in Utah, Idaho or Colorado as if it actually occurred in Utah, and compare the relevant interests and contacts of Utah with those of Pennsylvania. We determine that Pennsylvania's interests would not be harmed if we applied Utah law but that Utah's interests would be harmed if we applied Pennsylvania law. Because of this false conflict favoring Utah, we apply Utah law.

Pennsylvania's interest in encouraging the parties to a contract to negotiate liability terms has no relationship to this case because Air Products and Lumbermens never negotiated a contract. Indeed, even the contract between Lumbermens and Eaton, of which Air Products claims derivative beneficiary status, was negotiated in 1984, some ten years before Air Products and Eaton entered into their agreement. Pennsylvania has no contact with the dispute between Air Products and Lumbermens relevant to its interest in encouraging the negotiation of liability terms.

Pennsylvania's interest in protecting manufacturers from excessive liability is similarly unconnected to the dispute between Lumbermens and Air Products. The only contact that could be relevant to this rationale for the application of Pennsylvania's economic loss doctrine would be with the defendant. Here, Lumbermens is an Illinois corporation, not a Pennsylvania corporation. Thus, Pennsylvania has no contact with the dispute between Air Products and Lumbermens relevant to its interest in protecting manufacturers from extraordinary liability. *Rosen v. Tesoro Petroleum Corp.*, 399 Pa.Super. 226, 582 A.2d 27, 30–31 (1990) (Pennsylvania has no interest in applying a defendant-protective malicious prosecution rule to Texas defendants); *Turcotte v. Ford Motor Co.*, 494 F.2d 173, 178 (1st Cir.1974) (Massachusetts has little interest in shielding a foreign corporation from liability under a statute limiting wrongful death recovery); *see Waschel v. King Tour & Travel Srvcs., Inc.*, 43 Pa D & C 4th 52, 56–57, 1999 WL 1539022 (Pa. Com. Pl. Oct 29, 1999) (Pennsylvania has no interest in applying its rules of the road to conduct occurring on New Jersey roads even though injured plaintiff was a Pennsylvania domiciliary).

Utah's interests are both strongly connected to this case. Utah's policy of not extending protection against liability for purely economic losses into the sphere of professional services is supported by contacts with the case in that Lumbermens was charged with the engineering inspection of product manufacturing facilities within the state of Utah. Similarly, Utah's interest in governing the conduct of negligent actors is connected to the case by virtue of the facts that Lumbermens' allegedly negligent conduct took place within the borders of Utah and that Lumbermens' inspectors were authorized and certified by the state of Utah.

Utah's interests in holding professionals accountable for their professional malpractice and in preventing tortious conduct within its borders would be thwarted by the application of Pennsylvania law, which would bar Air Products' claims against Lumbermens. Because Pennsylvania has no contact with the dispute between Air Products and Lumbermens relevant to the policy concerns that underlie its economic loss doctrine, those policy concerns would not suffer by the application of Utah law to that dispute. Thus we find that there is a false conflict between Utah law and Pennsylvania law and that Utah law must be applied to determine whether Air Products' negligence claims against Lumbermens may go forward.

Because we find that a false conflict exists, we need not continue to an evaluation of which state has a greater interest

in the application of its laws. Nevertheless, in the following section, we assume *arguendo* that a true conflict does exist but determine, nevertheless, that Utah has a greater interest in applying its law to each of the plaintiff's tort claims against Lumbermens.

### 3. Which State has the Greater Interest in the Application of Its Laws?

Even if we had found that a true conflict exists between Utah law and Pennsylvania law, we would nevertheless find that Utah's interest in applying its law is greater than that of Pennsylvania in applying its law.[18] This is particularly true in light of the fact that only those contacts which relate to the policies and interests underlying the particular issue before us are relevant. *Cipolla*, 267 A.2d at 856.

As we have already mentioned, the Restatement (Second) of Conflicts suggests the application of a general rule of contacts analysis to most torts, laid out in section 145, but defines "special rules" for certain torts that have well-defined Conflicts analysis methods, discussed in sections 146 through 155. Restatement § 145, cmt. a. The torts alleged in Counts 15 and 17, negligence and negligent provision of services, do not fall within any "special rule," and we therefore analyze them under the generally applicable methodology of section 145. Negligent misrepresentation, Count 16, is covered by the special rule for "Fraud and Misrepresentation," section 148. Restatement § 148, cmt. a. The substantive outcome, that Utah has a greater interest in applying its law, is no different under either mode of analysis.[19]

### a. Negligence and Negligent Provision of Services (Counts 15 and 17)

The Restatement (Second) of Conflict of Laws lays out a hierarchy of contacts that must be evaluated to determine which state has the most significant contacts with the dispute, and therefore the greatest interest in applying its laws, which include the place of injury; the place where the conduct causing the injury occurred; the place of business or incorporation of the parties; and the place where the relationship between the partes is centered. Restatement (Second) of Conflict of Laws § 145(2); *Cipolla*, 267 A.2d at 856. As the comments to the Restatement make clear, the weight to be given the various contacts depends on the character of the dispute and the quality of the contact.

The first contact to be evaluated is the place of injury. Lumbermens contends that, because the injury is financial in nature, it occurred at the plaintiff's principal place of business in Allentown, Pennsylvania. Even if true, this would not determine the outcome of our analysis because it is only for "injuries to tangible things" that "the place where the injury occurred is the contact that, as to most issues, plays an important role in the selection of the applicable law." Restatement, § 145, cmt. e (1971). When the injury is purely financial, this factor loses significance. Even if the factor were significant, Pennsylvania's interests in applying its economic loss doctrine have no relationship to this contact. Although the financial injury may have occurred here, as we have already noted, no contract was ever consummated be-

---

18. As with the previous section, we refer only to Utah contacts in this section because we treat any contact that occurred in Utah, Colorado or Idaho as having occurred in Utah because the three states' local law with regard to the economic loss doctrine is identical with respect to this plaintiff's negligence claims. *See supra* Part IV.B.2.

19. We emphasize that because we have already found that a false conflict exists between Pennsylvania and Utah law, we need not conduct the analysis that follows. We do so assuming, for the sake of argument, that a true conflict exists.

tween Air Products and Lumbermens. Moreover, although the *plaintiff* may be said to have been injured in Pennsylvania, Pennsylvania's interest in protecting manufacturers from excessive liability applies only to *defendant manufacturers*. Thus, only if Lumbermens were also located within Pennsylvania would this contact be relevant to Pennsylvania's policy interests.

Moreover, in this case, although it is clear that the damage Air Products alleges Lumbermens to have done is purely financial, the location of that injury is not as clear as Lumbermens would have it. First, although Air Products' principal place of business is in Allentown, Pennsylvania, not a single Eaton vessel was ever shipped to Pennsylvania. Although Air Products may have *felt* the injury to its finances in Allentown, the financial injury may have been *done* elsewhere. Second, in cases involving defectively manufactured products, the secondary economic effects of the injury may not be the kind of injury to which the Restatement refers. The Third Circuit has held "that when a commercial entity sues for tortious injury to its physical property, the 'injury' takes place for jurisdictional purposes where the property has been damaged." *Carty v. Beech Aircraft Corp.*, 679 F.2d 1051, 1065 (3d Cir.1982). *Carty* dealt with the issue of where economic injury occurs from the standpoint of jurisdiction rather than choice of law, but we believe that it is applicable to this case in the sense that Air Products' claims arise out of injuries to its vessels (in that they were defectively manufactured) from which flow economic consequences. *See Id.* at 1064 (distinguishing between "possible 'consequences' to a business and the 'legal injury' "); *Northeastern Power Co. v. Balcke–Durr, Inc.*, 49 F.Supp.2d 783, 787–88 (E.D.Pa.1999) (applying *Carty* to defective manufacture claim alleging only economic loss and finding that because the product was located in Pennsylvania, Pennsylvania's law applied).

Thus, in a case involving a defectively manufactured aircraft that caused only economic damages by virtue of its grounding while awaiting repair, the Seventh Circuit Court of Appeals found that "it could be argued that ... the place of injury should be deemed to be Georgia, where Lockheed breached its duty to manufacture a defect-free product." *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 528 (7th Cir.1981). However, because it could not be determined where the defect had actually occurred, the court chose to accept an alternative argument ("more plausible" than that in favor of the state where the defect was fortuitously discovered) that the situs of the injury was where the economic consequences of the defect were felt, which was Illinois. *Id.* at 527– 28.[20] As in *Pittway*, it is not clear exactly where the cracks in the walls of the vessels occurred. In such a case, we are faced with the choice of locating the injury where it was felt, in Pennsylvania, or where it was done, in Utah.[21] We would

**20.** Because the choice of this argument over that in favor of applying Georgia law had no effect on the outcome of the case, we treat the argument in favor of applying Georgia law, i.e. that that was where the defective product was manufactured, as an alternative holding in the case.

**21.** Lumbermens attempts to distinguish *Pittway* on the basis that its position is not analogous to that of Lockheed because, unlike Lockheed, Lumbermens did not manufacture the defective products. Lumbermens argues that this distinction is important because the only injury it could have done would be purely financial because Eaton and not Lumbermens caused the cracks in the walls of the pressure vessels. However, Lumbermens ignores the fact that Air Products' allegations include the contention that Lumbermens negligently supervised the handling of welding consumables, and that this negligent supervision led directly to the defects in the vessels because through-wall cracks are most often related to improper handling of welding con-

choose Utah, but the very flexibility of the choice demonstrates that this factor should not be given great weight.[22]

"When the place of injury cannot be ascertained," as we have found it difficult to ascertain here, "the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law." Restatement, § 145 cmt. e. There is no dispute that Lumbermens' allegedly negligent acts took place primarily in Utah. As we have already established, Utah's interest in governing tortious conduct within its borders is closely connected with the location of the conduct here alleged, in that it took place in Utah. Thus, this contact weighs heavily in favor of applying Utah law to those negligent acts.

The next contact is the principal place of business of the parties, which in this case are Pennsylvania (Air Products) and Illinois (Lumbermens). In this dispute, it is clear that this contact is to be accorded little weight in the contacts analysis for, "[w]hen the interest affected is a personal one such as a person's interest in his reputation, or in his right to privacy or in the affections of his wife, domicil, residence and nationality are of greater importance than if the interest is a business or financial one." Restatement § 145, cmt. e. Lumbermens' assertion that "plaintiff's principal place of business is 'the single most important contact' when injury involves financial matters," SJ Mot. at 9 (quoting Restatement § 145, cmt. e), is a mischaracterization of that portion of the Restatement commentary accomplished by the use of partial quotation. The plaintiff's place of business is the "single most

important contact *for determining the state of the applicable law as to most issues in situations involving the multistate publication of matter that injures plaintiff's reputation (see § 150) or causes him financial injury (see § 151) or invades his right of privacy (see § 153)."* Restatement § 145, cmt. e (emphasis supplied). As this case involves none of these three causes of action but does involve a purely financial injury, this contact is of minimal importance. Moreover, because Pennsylvania's interest in protecting manufacturers would only assume relevance if it were the *defendant* who had its principal place of business in Pennsylvania, the fact that the *plaintiff* is located here cautions against according this factor significant weight.

The place where the parties' relationship is centered is the final factor in this analysis. Although Lumbermens contends that this factor is neutral, we believe that it favors the application of Utah law. The parties had no contract in Pennsylvania and none of the vessels inspected by Lumbermens were ever shipped to Pennsylvania. The only contact between the Air Products–Lumbermens relationship and Pennsylvania was in the delivery of the signed Manufacturer's Data Reports to Air Products in Allentown. In contrast, Lumbermens inspected all of the vessels made for Air Products in Utah and all of the Manufacturer's Data Reports were signed and shipped from there. Given these factors, and their association with Utah's interests in applying its version of the economic loss doctrine, we would find that the relationship between Air Products and Lumbermens was centered in Utah. Because this is also the primary site of Lum-

---

sumables. Therefore, it may well be that Lumbermens bears some portion of the responsibility for the damage done to the vessels. Thus, the discussion in *Pittway* of the difficulty of ascertaining the place of injury, even in economic loss cases, is relevant here.

**22.** Even if the economic loss is properly considered to be the relevant injury, its location is unclear. *See infra*, p. 40–41.

bermens' allegedly negligent conduct, this factor should be given great weight. Restatement § 145, cmt. e. Thus, even if we had found that there was a true conflict between Pennsylvania and Utah law, we would find that Utah has a greater interest in applying its law to Counts 15 and 17 of Air Products' Second Amended Complaint.

b. Negligent Misrepresentation (Count 16)

Section 148 of the Restatement (Second) provides that:

When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied. Restatement § 148(1).

Although the plaintiff contends that the relevant harm is to the vessels it purchased from Eaton (and therefore that Count 16 should be governed by section 147, "Injuries to Tangible Things," *see* Restatement § 148, cmt. a), it is clear that as between Air Products and Lumbermens, the relevant harm is pecuniary in nature.[23] Thus, section 148 applies to this Count.[24]

It is not clear, however, where the plaintiff's actions in reliance took place. *See infra*, p. 40–41. Even assuming that they took place in Pennsylvania, where the misrepresentations were undoubtedly received at Air Products' primary place of business, the misrepresentations were *made* in Utah, where Lumbermens signed the allegedly misrepresentative Manufacturer's Data Reports. Thus, even if Air Products' reliance on Lumbermens' alleged misrepresentations took place in Pennsylvania, it did not take place in the same state in which both the making and receipt of the misrepresentations occurred. The default rule outlined in the first part of section 148 therefore does not govern the plaintiff's negligent misrepresentation claim.[25]

---

**23.** Although we find that the harm is pecuniary in nature, this says little on the issue of where the harm was suffered. *See supra*, p. 502–503; *infra*, p. 505–506.

**24.** We are aware of no Pennsylvania case adopting or applying section 148 of the Restatement (Second) of Conflicts. At least one United States District Court judge in this district has, in part for this reason, declined to apply it. *Financial Software Systems, Inc. v. First Union Nat'l Bank*, Civ.A.No. 99–623, 1999 WL 1241088, at *7 n. 7 (E.D.Pa. Dec. 16, 1999). Nevertheless, we will follow the majority of federal courts in this district to have considered the issue and apply section 148 to the plaintiff's negligent misrepresentation claim. *See, e.g., Owen J. Roberts School Dist. v. HTE, Inc.*, Civ.A.No.02–7830, 2003 WL 735098 (E.D.Pa. Feb. 28, 2003); *CAT Internet Srvcs., Inc. v. Magazines.com, Inc.*, Civ.A.No. 00–2135, 2001 WL 8858 (E.D.Pa. Jan.4, 2001); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206 (E.D.Pa.2000). We note that ap-

plying section 148 rather than section 145 has no effect on the substantive outcome of our decision.

**25.** We note that even could we say that the making, receipt and reliance upon the alleged misrepresentations had all occurred in Pennsylvania, the fact that, as we have already found, Utah has a greater interest in the application of its laws (by virtue of the fact that Pennsylvania has little or no contact with the dispute relevant to its underlying policy goals), *see supra*, Part IV.B.2, would necessitate the application of Utah's laws under the "unless" clause in part one of section 148. *See* Restatement, § 148(1) (When the making, receipt and reliance upon the alleged misrepresentation occurs in the same state, that state's law will apply "unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.").

When the default rule of part one of section 148 does not apply, the Restatement suggests several factors, in order of importance, relevant to the determination of which state's law applies:

(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,

(b) the place where the plaintiff received the representations,

(c) the place where the defendant made the representations,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties,

(e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Restatement § 148(2).

As the commentary notes, "When the loss is pecuniary in its nature, the place of loss is far more difficult to locate than when the damage consists of physical injury to persons or to tangible things." Restatement § 148, cmt. c. Indeed, when the loss consists of a relinquishment of assets (as is the case here), equally persuasive arguments can be made for placing the situs of the loss where the plaintiff relinquishes the assets or where the plaintiff receives the consideration for the relinquishment of assets. In this case, Air Products presumably released payment for the Eaton vessels at its place of business in Allentown, Pennsylvania, but received the consideration for that relinquishment wherever those vessels were accepted for delivery (about which all can be said for certain is that it was not in Pennsylvania). *Id.* "The place of loss may be even more difficult to locate when plaintiff relinquishes no assets to the defendant but binds himself by contract to embark upon a given course of action," *Id.*, as is the case here; Air Products offered no payment to Lumbermens but, instead, was bound by contract to accept the vessels from Eaton after they had been verified by Lumbermens. Thus, it is far from clear where Air Products' loss occurred, and for that reason it is of little importance in determining which state has the greater interest in applying its laws. *Id.*

The first and most important contact, therefore, is the place of the plaintiff's reliance on the misrepresentation. Restatement § 148, cmt. f. Lumbermens argues that Air Products' acts of reliance were the decisions to accept the vessels and to pay for them. However, Air Products accepted no vessels in Pennsylvania. Given that vessels were shipped to many states, and delivery accepted in many different states, we cannot say that Air Products acted in reliance on the misrepresentations in only a single state, let alone that they did so in Pennsylvania. This contact has less significance when the plaintiff's reliance occurred in more than one state.[26] Restatement § 148, cmt. f.

Next in importance is the place where the plaintiff received the misrepresentations. In this case, there is no dispute that Air Products received the allegedly misrepresentative Manufacturer's Data Reports in Pennsylvania. However, nei-

---

**26.** It is true that where the majority of reliance takes place in a single state, and a lesser portion in another state, the former state may be judged the state with the greater interest in applying its laws, Restatement § 148, cmt. f. Here, however, there is no way to determine where the "majority" of the reliance occurred. We believe that because the acceptance of delivery is as important an act of reliance as payment, this contact should not be given great weight.

ther of the policy goals underlying Pennsylvania's version of the economic loss doctrine have any relationship to this single contact with Pennsylvania. First, Air Products and Lumbermens had no direct contractual relationship, thus there is no reason to apply a rule that provides an incentive to negotiate terms of liability for negligent misrepresentations. Second, Pennsylvania's defendant-protective motive of shielding manufacturers from excessive liability in tort has no application to a situation in which a misrepresentation was received by a Pennsylvania plaintiff from a *non-Pennsylvania* defendant. Only if Lumbermens were a Pennsylvania corporation would this contact weigh in favor of applying Pennsylvania law.[27]

Of equal importance to the location of the receipt of a misrepresentation is the location of the making of the misrepresentation. Restatement § 148, cmt. g. Here, all of the Manufacturer's Data Reports were signed in Utah or Idaho. Both of Utah's underlying policy goals are connected to this contact with Utah. First, Lumbermens provided professional inspection services within the state of Utah. Utah's interest in holding professionals accountable for malpractice is directly associated with this contact. Second, Lumbermens was authorized and required by the state of Utah to adhere to a duty of care defined by state law. Utah's interest in governing conduct that violates a state-created duty of care is directly connected with Lumbermens' allegedly tortious conduct within its borders.

Contact (e) also weighs in favor of applying Utah law. The subject of the transaction between Air Products and Eaton (and, by extension, Lumbermens) was the pressure vessels. These vessels were presum-

ably located in Utah awaiting shipment when the Manufacturer's Data Reports were shipped to Air Products in Pennsylvania. At the very least, because none of the vessels was ever shipped to Pennsylvania, Pennsylvania has no relationship to the "location of the tangible thing which is the subject of the transaction." Restatement § 148(2)(e).

Contacts (d) and (f) are essentially neutral. As we have previously noted, Air Products' reliance on Lumbermens' alleged misrepresentations took place in more than one state. In such a case, the relative importance of their primary place of business and of the location of their expected performance is minimal. *See* Restatement § 148, cmt. i.

■ The Restatement suggests that in the usual case, when two or more contacts of (a) through (f) (not including (d)) weigh in favor of the application of a given state's law, that state's law should govern. Here, we have found that contacts (a), (b) and (f) are of little or significance, and, in any event, do not weigh in favor of a particular state. In contrast, both contacts © and (e) tilt heavily toward the application of Utah law. We therefore would apply Utah law to Count 16 even if we had not already found that a false conflict exists between Pennsylvania and Utah law.

**C. Application of the Relevant Law to Counts 15, 16 and 17**

■ As we have previously discussed, *supra*, p. 491–497, neither Utah, Colorado nor Idaho would bar any of the plaintiff's negligence claims in Counts 15, 16 or 17 under the economic loss doctrine. However, Idaho simply does not recognize the tort of negligent misrepresentation "except

---

**27.** This discussion, essentially a reprise of our earlier false conflict analysis, *supra* Part IV. B.2, demonstrates again the fact that there is no true conflict between Pennsylvania and

Utah law. Pennsylvania simply has no contacts with the dispute between Air Products and Lumbermens relevant to its underlying policy goals.

in the narrow confines of a professional relationship involving an accountant." *Duffin v. Idaho Improvement Association*, 126 Idaho 1002, 895 P.2d 1195, 1203 (1995). Thus, although Idaho and Utah would treat Count 16 in the same way with regard to the economic loss doctrine, they would not treat it similarly with regard to whether the tort is recognized at all.

This distinction is important because a thorough review of the record before us indicates that Lumbermens signed most, though not all, of Eaton's Manufacturer's Data Reports at the Pocatello, Idaho plant rather than at the Salt Lake City, Utah plant. This is not the proper stage of litigation to resolve factual disputes, and to the extent that the parties dispute where any Manufacturer's Data Reports were signed, we are powerless to grant Lumbermens' motion as to specific acts of negligent misrepresentation committed when a given Manufacturer's Data Report was signed. We can, however, grant Lumbermens' motion generally with respect to those acts of negligent misrepresentation alleged under Count 16 that occurred in the state of Idaho (i.e., when Lumbermens signed a given Manufacturer's Data Report in Idaho) and leave the factual dispute as to exactly which Manufacturer's Data Reports were signed where for trial.

As to counts 15 and 17, all three relevant states would find that Lumbermens owed a duty to Air Products to perform its inspections with the degree of skill, knowledge and care mandated by the ASME code. Liability for negligence in discharging this duty is not shielded by the economic loss doctrine in any of the three states, and Air Products' counts of negligence and negligent provision of services (Counts 15 and 17) against Lumbermens will be allowed to proceed.

## V. CONCLUSION

Idaho and Colorado would treat the plaintiff's negligence claims the same way that Utah would under the economic loss doctrine. There is no true conflict between Pennsylvania and Utah law with regard to the plaintiff's negligence claims against defendant Lumbermens. Because this is a case of false conflict, we apply the law of the state whose interests would be harmed by the application of the laws of the other state; in this case, we apply the law of Utah. Even if this were not a case of false conflict we would still apply Utah's law because Utah has a greater interest in the application of its laws than does Pennsylvania in the application of its laws. Air Products' negligence claims against Lumbermens are not barred by Utah's version of the economic loss doctrine and we therefore deny Lumbermens' motion for partial summary judgment on those claims, though we grant Lumbermens' motion with respect to those acts of negligent misrepresentation that took place in Idaho. An appropriate order follows.

## ORDER

AND NOW, this 27th day of May, 2003, upon consideration of Air Products and Chemicals, Inc.'s Motion for Leave to File a Sur–Reply Brief, filed May 19, 2003, it is hereby ORDERED that the Motion is GRANTED and the Sur–Reply Brief Attached to Air Products' Motion is hereby DEEMED FILED.

## ORDER

AND NOW, this 27th day of May, 2003, upon consideration of the Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, for Partial Summary Judgment on Certain Tort Claims, filed April 11, 2003, and brief in support thereof, and Plaintiff Air Products and Chemicals, Inc.'s Brief in Opposition to

Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, filed May 5, 2003; Reply Brief in Support of Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, for Partial Summary Judgment on Certain Tort Claims, filed May 16, 2003; Plaintiff Air Products and Chemicals, Inc.'s Sur-Reply Brief in Opposition to Motion of Defendant, Lumbermens Mutual Casualty Insurance Company d/b/a Kemper National Insurance Companies, for Partial Summary Judgment on Certain Tort Claims, filed May 22, 2003; and Defendant Lumbermens Mutual Casualty Company's amended Reply Brief in Support of its Motion for Partial Summary Judgment on Certain Tort Claims, filed May 22, 2003, it is hereby ORDERED that:

1. The motion is GRANTED with respect to those acts of negligent misrepresentation alleged under Count 16 of the Plaintiff's Second Amended Complaint that occurred in the state of Idaho.

2. The motion is DENIED in all other respects.